[No. A045323. First Dist., Div. Four. Jan. 9, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL HERNANDEZ MONTANO, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Philip M. Brooks, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan Helfman and Morris Beatus, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, J.**—Following his arrest for murder, defendant Manuel Hernandez Montano[1] was subjected to lengthy interrogation by two members of the Concord Police Department. Although defendant was advised of his constitutional rights pursuant to *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], the officers had previously decided not to respect any attempt by defendant to invoke his right to remain silent. This stratagem succeeded; following numerous futile efforts at terminating the interrogation, defendant made an admission so damaging as to be tantamount to a confession. Defendant made a full confession to the murder at a second interrogation session conducted several hours later. The trial court granted defendant's motion to suppress remarks he made at the first interrogation session, but refused to exclude evidence of the confession. The issue of defendant's guilt was thereafter submitted to the trial court, which found him guilty of attempted rape (Pen. Code, §§ 261, subd. (2), 664) and first degree murder with the special circumstance that the murder occurred during the commission of attempted rape (Pen. Code, §§ 187, 190.2, subd. (a)(17)(iii)). The court further found true allegations that each offense involved the personal use of a deadly weapon (Pen. Code, § 12022, subd. (b)), and that the attempted rape also involved the intentional infliction of great bodily injury (Pen. Code, § 12022.8). Defendant was thereupon sentenced to state prison for the term of life imprisonment without possibility of parole.

On his appeal from the ensuing judgment of conviction defendant contends that (1) the interrogating officers persistent refusal to honor his invocation of his constitutional privilege against self-incrimination during the first session was so egregious as to taint the subsequent confession and disqualify it for admission at the trial, and (2) there was insufficient evidence of attempted rape to sustain either his conviction on that count or the special circumstance finding. We find the first contention meritorious and sufficient to require reversal of the judgment. Defendant's second contention we find to be without merit.

### BACKGROUND

The circumstances of the murder are admitted. Shortly after midnight on October 4, 1987, on a public street in Concord, an intoxicated defendant accosted a young woman as she returned to her grandmother's home. For reasons not entirely clear, defendant stabbed her on the sidewalk with a

---

[1] Defendant's name is also given as Manuel Montano Hernandez at various points in the record.

large fixed-blade knife. He then dragged her behind a divider hedge in a parking lot, leaving a 70-foot trail of blood behind him. Once behind the hedge, defendant began a stabbing frenzy. Alerted by a woman's scream and the reports of onlookers, police converged on the scene. Behind the hedge they found the perforated, semi-nude body of the young woman.

Defendant, who was observed running from behind the hedge, was apprehended nearby. He was transported to the Concord Police Department. At 4:03 a.m., Officers Breuker and Kincannon began interrogating defendant. Officer Breuker did most of the questioning. The format was that Officer Breuker's questions in English were translated into Spanish by Officer Kincannon, who then translated defendant's answers into English for the record. A tape recording was made of the interrogation.

At the outset of the session defendant was advised of his rights pursuant to *Miranda* v. *Arizona, supra*, 384 U.S. 436. Defendant agreed to talk with the officers. Officer Breuker began with some questions about defendant's background, eliciting the information that defendant had illegally entered the United States from Mexico eight months before. During the course of the previous evening he had eaten nothing, but had consumed eight or nine beers.

Asked by Officer Breuker to "[e]xplain to me how you feel," defendant answered: "I feel badly. I feel . . . I feel that I am bad with myself." Defendant acknowledged that he had a "quite serious" problem, and that that problem was why the police had stopped him. Defendant had never had "a problem like this before," and had never had problems with the police. After he got defendant to admit having carried a large knife that night, Officer Breuker asked: "I know you met a lady tonight . . . . True?" Defendant responded that "I feel bad answering the question." Officer Breuker stated: "I can see the tears in your eyes. I know what happened tonight made you very, very bad feeling. Okay, feel bad about that. I know it's in your mouth. What you want to tell me is right in your mouth. It just needs a little pushing to get it out . . . . But we take it a, a little at a time." The following (with minor editorial changes) are excerpts of what occurred thereafter:

"Q. You met a girl tonight, didn't you Jose?[2]

"A. I don't know . . . .

"Q. It's a bad thing that happened tonight, right?

---

[2] Defendant originally identified himself as José Gonzales Calvo during the first interview.

"A. Yes, but (pause) I shouldn't, *I shouldn't like to continue talking about that.*

"Q. Okay. Can we talk about some other things?

"A. Yes . . . .

"Q. Okay. Were you gonna go back to Mexico soon?

". . . . . . . . . . . . . . . . . . . .

"Q. We pretty much know what happened. I need to fill in just a couple of areas. Did she attack you in any way? Did she hurt you in any way?

"A. I don't remember.

"Q. Okay. Did you want to hurt her just a little bit? Did you just want to try to scare her a little bit?

"A. I don't remember. *I should not like to talk more about this.*

"Q. Okay. (Pause) We found a knife in the bushes. There was blood on the knife. It was your knife and we will be able to tell because of your fingerprints. There was blood on the knife. We will be able to tell whose blood it is. If it was yours from if you cut yourself, or if it was from somebody else. We know there's blood on your clothes. And we will also know if that's from him or somebody else. We know that there's blood on your shoes, and we will be able to tell if that blood is yours or from somebody else. There was blood in your pants pocket from when you put your hand in your pants. We will be able to tell if that blood was yours or somebody else's, because we took your blood sample. We'll be able to take trace evidence from your hands and match it to other evidence. I would simply like for him, if he can, to tell me why.

"A. *No, I don't want to talk more about this.*

"Q. Okay. (Pause) He doesn't want to talk to us anymore about this or he doesn't want to talk to us anymore, period.

"A. I feel badly. *I should not like to talk about anything.*

"Q. Okay. What do you think is going to happen now? What do you think is going to happen to you?

"A. Well, I don't know. I think that perhaps they will put me in jail.

"Q. Okay. Ah, does he know about jail in the United States?

"A. No.

"Q. Has he ever been in jail in Mexico?

"A. No.

"Q. Has he ever been in jail in the United States?

"A. No.

"Q. . . . Okay. Do you think you will be in jail for a long time?

"A. Yes.

"Q. Because of this bad problem, is that correct?

"A. Yes."

After Officer Breuker then left the room, Officer Kincannon and defendant continued in Spanish.

"Q. Was there a problem in talking with Bruce [Officer Breuker] because he didn't know how to speak Spanish?

"A. No. *It is just that I don't want to talk more.*

"Q. Okay. Is there a why [*sic*] you don't want to talk?

"A. Because I feel that it is not the time.

"Q. . . . Okay. When you say that it is not the time, why do you say that?

"A. Because I feel badly. I don't want to remember that. I should like, for the moment, to forget, to forget the problems that I had. I feel tired.

"Q. You feel tired?

"A. And *I should not like to talk more.*

"Q. Okay . . . . [T]here was a problem tonight. Okay? And we want to know if there is someone that, that we can call to tell them that you need help. Is there someone that we can call?

"A. I don't have anyone.

"Q. You don't have any friend, family members, no one that we can call?

"A. No.

". . . . . . . . . . . . . . . . . . . .

"Q. Okay . . . . You say that you want to forget all that happened tonight. Do you think you can? . . . When you have made errors in the past . . . how have you passed by the errors?

"A. I don't know what kind of errors.

"Q. Well, it doesn't matter what kind, okay? I have learned that the best way to overcome an error or a problem is to talk of the problem.

"A. Huh.

"Q. Okay? And the problem that you had tonight, ah, is, is a little serious, okay? I know that you also know that, but sometimes it is, it is better talking of this problem so that you can, how do you say, umm, let the feelings come out a little.

"A. Okay.

"Q. Now you have all the feeling of tonight here in your chest, okay? No one knows what you are thinking . . . . You, only you know what you were feeling. Okay? We are also here to feel what you are feeling. Do you understand? Okay? You are Catholic, no?

"A. Yes. I am Catholic.

"Q. Okay, and . . . have you done only catechism, through the classes?

"A. Uh huh.

"Q. Okay. What have they taught you in the classes?

"A. Well, the love of God, the respect for God . . . . And the way that one can live by Him . . . to respect Him, well, following what He says.

"Q. Okay. I also love God. I know that one of the basic things of the church is repentance, isn't that right?

"A. Yes.

"Q. Okay, and I also know that one of the basic steps of repentance is that we admit that we erred. Okay? We can't, we can't continue forward without, without saying that, that there was a problem. Okay? And now we are trying to help you in this respect. Do you understand me?

"A. Yes.

"Q. Okay. I know that it is important that you talk to us about this problem. Because if you don't talk of, to anyone you are going to, to fall. Do you understand?

"A. Yes.

"Q. Okay. And therefore we want to talk a little.

"A. But it is that *no, I shouldn't like to.*

"Q. What?

"A. *I shouldn't like to talk of that.*

"Q. Do you want to talk about this later?

"A. Perhaps.

"Q. Well, when you say perhaps, what does perhaps mean?

"A. Later, tomorrow.

"Q. Tomorrow?

"A. Maybe.

"Q. Maybe you want to talk tomorrow?

"A. Yes.

"Q. But you don't want to talk now?

"A. *Not now.*

"Q. Why?

"A. Well, I should like to relax, thinking about the error that I committed. More things.

"Q. About?

"A. About my life, about what I am going to do, about what is going to happen to me . . . . Right now I don't have the slightest idea what is going to happen to me.

"Q. Um hum. Okay. Do you know what has happened tonight?

"A. Yes, I know what has happened.

"Q. Okay. What has happened?

"A. *That is what I don't want to talk about.*

". . . . . . . . . . . . . . . . . . .

"Q. Do you know where this knife is now?

"A. No, I don't know.

"Q. Okay, what did you do with this? Where did you leave it? When was the last time that you saw it?

"A. *No, I don't want to talk more.*

"Q. Okay, do you want to talk tomorrow?

"A. Yes.

"Q. How do we know that you will want to talk tomorrow?

"A. Because I believe that I will feel better.

"Q. Um hum. Okay . . . . We would like to know what happened before we can see the blood and all, okay? It's (pause) . . . we would like to

know if there was a problem where this girl did something to you or said something to you . . . .

"A. No.

"Q. . . . that provoked you, okay? Because . . . you are eighteen years old. You are still young, okay? You have never done anything bad in your life . . . . Okay, what happens where you have done something that you think is bad, um, to such a degree? The girl didn't, didn't do anything to you?

"A. I don't know. I don't remember.

"Q. You remember, but you don't want to say now?

"A. Maybe it's that.

"Q. Maybe.

"A. Yes. Maybe I remember but *I don't, I don't want to talk.*

"Q. Okay, okay. Do me a favor, okay? If you remember, but don't want to talk about that, then tell me that, okay? Instead of saying, 'I don't remember', okay? . . . I am going to be a little frank here now, okay? Did something sexual happen tonight? . . . This woman, this girl, woman, did you want to know her?

"A. *I shouldn't like to talk more.*

"Q. The other officers want to talk. What are we going to do when they come? Again. Bruce [Officer Breuker] wants to talk to you a little bit more. What shall I say to him?

"A. . . . I don't know.

"Q. Okay. (Sigh) Okay. Jose, . . . okay. We now know what happened, okay?

"A. Um hum.

"Q. And we want you to tell us what happened on your side, okay? Your account, your history, okay? So that we don't feel all badly about what you say, okay? We know what happened tonight. We want to know what the feelings that you feel on, on doing that . . . . I don't feel that you

are a very badly [*sic*] person. But because of what happened tonight, people are thinking this . . . . And I feel that it is important that we know what you are feeling, to help us.

"A. Yes, but it is that I don't know how to talk more."

Officer Kincannon was pressing defendant about a possible interview ("I would like to know what happened tonight when I come tomorrow") when Officer Breuker returned to the room to be informed: "Bruce, he [defendant] is saying he's getting a little bit tired, and he'll, he's considering talking tomorrow." Officer Breuker then addressed defendant: "I was just gonna tell him this here. I just did the laboratory tests. The blood on your knife, the blood on your clothes. It was hers. It was hers. Okay, we just got done with those tests and it was hers. And on your shoes and your pants, on your hands, it was hers. (Sigh) (Pause) I don't know what to tell you, Jose. Uh, it is a very terrible problem like you said. Blood in your pants pocket, blood on your shoes. It was all her blood. She died. (Pause) Is something wrong? (Long pause) What do we need to do, Jose?

"A. I don't know.

"Q. Did you know her?

"A. No.

"Q. It's the first time you ever saw her tonight?

"A. Yeah, the first.

"Q. The first time. I'm sorry for you Jose. A very bad thing that happened to you here. (Pause) You didn't want to hurt her, did you? (Pause) You, you didn't intend to hurt her, did you?

"A. . . . *I don't want to talk more.* I don't want to know anything more."

Officer Breuker then questioned defendant about whether there was anyone he wanted notified. It was Officer Kincannon who then asked:

"Q. A little thing, okay Jose? . . . Tell me, do we have, do we have the person who should be here or is there a person who is still in the streets that we should be looking for? (Pause)

"A. No.

"Q. We shouldn't be looking for another person? . . . Okay, I was asking him if there was somebody else down the street that we should be looking for that's responsible. And he's just shaking his head no."

The interrogation was concluded at approximately 5:30 a.m. when Officer Breuker gave defendant his business card with the comment "if you want to talk with me, give me a call and I'll come down and talk with you." The officers then took defendant to be booked.

Approximately four hours later—at 10:15 a.m.—defendant told his jailer that he wanted to speak with Breuker. Officers Breuker and Kincannon commenced their second interview (which was also taped) with appellant at 12:42 p.m. Defendant was again admonished regarding his *Miranda* rights. Defendant then confessed to the murder. As defendant told it, when he approached the victim "I asked her if I could accompany her; she told me no, she told me: 'Go away from here.' " Feeling "bad, rejected," "a little furious," and wanting to scare her, defendant grabbed her by her neck from behind and drew his knife. The victim hit him, yelled, and tried to get away. Frightened and scared, defendant "put the knife in her." He then dragged her and "put her beside some trees," following which "I took off running." Defendant did not recall stabbing the victim more than twice.

Defendant's suppression motion sought exclusion of all remarks he had made during the course of both interrogation sessions, on the ground that the officers' failure at the first interrogation session to respect his invocation of his right to remain silent was sufficiently egregious as to constitute a violation of due process and thus taint as involuntary the confession made at the second interrogation session. This motion was the subject of an evidentiary hearing conducted at the outset of defendant's bench trial. During the course of the hearing the trial court listened to the tapes and heard testimony from Officer Breuker among others. The trial court's ruling appears to have been this: Defendant invoked his right to remain silent at the point where he told the officers that he felt bad answering the question about meeting a woman. What occurred thereafter "was certainly more than a technical violation" of *Miranda*, requiring exclusion of defendant's statements. The confession was found "admissible because it's not a product of the first."

The confession was admitted in the prosecution's case-in-chief at the trial. At the conclusion of the penalty phase of the trial the court ordered defendant to serve the term of life imprisonment without possibility of parole as required by Penal Code section 190.3, the court having determined that circumstances in mitigation outweighed those in aggravation.

Following denial of his motions for a new trial and to strike the special circumstance finding, defendant filed a timely notice of appeal.

REVIEW

I

Had this case arisen prior to passage of the initiative measure commonly known as Proposition 8, reversal would clearly be required by the rule of *People* v. *Pettingill* (1978) 21 Cal.3d 231 [145 Cal.Rptr. 861, 578 P.2d 108]. ■ In the wake of Proposition 8, however, California courts apply federal standards to *Miranda*-related issues of both substance (see *People* v. *May* (1988) 44 Cal.3d 309 [243 Cal.Rptr. 369, 748 P.2d 307] [following federal rule that statement obtained in violation of *Miranda* can be used for impeachment; abrogating former California rule to the contrary]) and procedure (see *People* v. *Markham* (1989) 49 Cal.3d 63 [260 Cal.Rptr. 273, 775 P.2d 1042] [following federal rule that waiver of *Miranda* protections need be proven by preponderance of evidence; abrogating former California rule requiring proof beyond a reasonable doubt]). The following analysis is based upon those federal standards with which we now comply.

■ This is the core of *Miranda*: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Miranda* v. *Arizona, supra,* 384 U.S. 436 at pp. 473-474 [16 L.Ed.2d at p. 723.) The Supreme Court has subsequently explained: "A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . . .' 384 U.S., at 479 . . . The critical safeguard identified in the passage at issue [i.e., the passage from *Miranda* just quoted] is a person's 'right to cut off questioning.' *Id.,* at 474 . . . Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent

depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " (*Michigan* v. *Mosley* (1975) 423 U.S. 96, 103-104 [46 L.Ed.2d 313, 321, 96 S.Ct. 321], fn. omitted.)

■ Before reaching the merits of the problem before us, it is appropriate to establish the governing standard of our review. As will be seen, that problem involves whether defendant's confession was voluntary in the constitutional sense. Because that inquiry is to be resolved on the basis of uncontradicted evidence, we must undertake an independent and plenary determination as to whether defendant's confession was truly voluntary. (See *Miller* v. *Fenton* (1985) 474 U.S. 104, 109-118 [88 L.Ed.2d 405, 410-416, 106 S.Ct. 445]; *People* v. *Mattson* (1990) 50 Cal.3d 826, 854, fn. 18 [268 Cal.Rptr. 802, 789 P.2d 983]; *People* v. *Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Boyer* (1989) 48 Cal.3d 247, 263 [256 Cal.Rptr. 96, 768 P.2d 610].) The People, in order to prevail on this point, are obliged to demonstrate by a preponderance of the evidence that defendant's confession was the product of his free will.[3] (See *Colorado* v. *Connelly* (1986) 479 U.S. 157, 167-169 [93 L.Ed.2d 473, 484-486, 107 S.Ct. 515]; *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619]; *People* v. *Markham, supra,* 49 Cal.3d 63 at p. 71.)

■ We begin by agreeing with the trial court as to the point at which defendant invoked his right to remain silent, namely the point at which defendant said, "I feel bad answering the question" about his meeting a woman that night. The Attorney General raises no dispute on this point, but defendant does. He argues that he first invoked the right much earlier in the interrogation with his response "I can't" when Officer Breuker asked him, "Can you tell us what happened?" That response does not amount to an invocation. (See *Taylor* v. *Riddle* (4th Cir. 1977) 563 F.2d 133, 136-137.) The response that the trial court treated as an invocation undoubtedly lacks the unambiguous and emphatic certainty of defendant's later replies, but it does evidence a reluctance to answer that does not embrace the possibility of ignorance. Having listened to the tape of the interrogation we have no basis for disagreeing with the trial court's conclusion that "at that time it's got to [have] become obvious to the officers that he doesn't wish to talk

---

[3] In his brief the Attorney General initially appears to treat the issue as one involving the validity of defendant's waiver of his right to silence as found by the trial court. He quickly realizes, however, that no such finding was in fact made by the trial court, and that the very idea of a valid waiver cannot coexist with coercion. He goes on to argue that the confession was not induced by coercion. The Attorney General's stance does not involve a significant shift of appellate posture: instead of arguing that the trial court's ruling is supported by substantial evidence, the Attorney General has to convince us—as the District Attorney convinced the trial court—that the voluntariness of defendant's confession is established by a preponderance of the uncontradicted evidence. (See *People* v. *Kelly* (1990) 51 Cal.3d 931, 947, 950 [275 Cal.Rptr. 160, 800 P.2d 516].)

about it anymore."[4] The trial court correctly ruled that *Miranda* mandated a halt to the interrogation which, because it was not discontinued by the officers, required suppression of all subsequent statements made by defendant at that interrogation session.

■ With considerable understatement, the trial court stated that what transpired thereafter at the first interview "was certainly more than a technical violation" of *Miranda*. The term "technical" is of more than passing interest because it has become something akin to a term of art in this field. The familiar warnings required by *Miranda* are at present construed as judicially declared rules intended to secure the constitutional right against self-incrimination, but the warnings are not themselves rights of constitutional stature. (See *Connecticut* v. *Barrett, supra*, 479 U.S. 523 at p. 528 [93 L.Ed.2d at pp. 927-928]; *Moran* v. *Burbine* (1986) 475 U.S. 412, 424-425 [89 L.Ed.2d 410, 422-424, 106 S.Ct. 1135]; *Oregon* v. *Elstad* (1985) 470 U.S. 298, 305 [84 L.Ed.2d 222, 229-230, 105 S.Ct. 1285]; *New York* v. *Quarles* (1984) 467 U.S. 649, 654 [81 L.Ed.2d 550, 555-556, 104 S.Ct. 2626].) "[T]he right to silence described in those warnings derives from the Fifth Amendment and adds nothing to it." (*Roberts* v. *United States* (1980) 445 U.S. 552, 560 [63 L.Ed.2d 622, 630-631, 100 S.Ct. 1358].) The warnings are, in short, only a means toward the end of safeguarding the suspect's Fifth Amendment right. (See *Doyle* v. *Ohio* (1976) 426 U.S. 610, 617 [49 L.Ed.2d 91, 97, 96 S.Ct. 2240]; *Michigan* v. *Tucker* (1974) 417 U.S. 433, 443-444 [41 L.Ed.2d 182, 192-193, 94 S.Ct. 2357].)

In *Oregon* v. *Elstad, supra*, 470 U.S. 298, the suspect made incriminating statements before being advised of his rights pursuant to *Miranda*. He thereafter made a full confession. During the course of holding that the confession should not be suppressed as the poisoned fruit of the *Miranda* violation, the Supreme Court differentiated between a *Miranda* violation of nonconstitutional dimension and a more serious infringement of a suspect's constitutional rights. What the Court called "procedural" or "technical" violations of *Miranda* (see *id*. at pp. 306, 318 [84 L.Ed.2d at pp. 230-237])—

---

[4] It might be argued—although the Attorney General does not do so—that defendant's response was sufficiently equivocal that the officers were entitled to continue the interrogation. Had the officers thought they confronted an equivocal invocation, they would have been authorized to put "further questions . . . limited to clarifying whether the suspect in fact desires to terminate the interrogation . . . . [Even a] suspect's equivocal request to cut off questioning 'serves as a complete bar to any questioning related to the subject of the initial interrogation for a "significant period of time" after the request.' " (*Delap* v. *Dugger* (11th Cir. 1989) 890 F.2d 285, 290; accord *United States* v. *Fouche* (9th Cir. 1987) 833 F.2d 1284, 1287; *Christopher* v. *State of Fla.* (11th Cir. 1987) 824 F.2d 836, 841-844.) Of course, this is clearly not what occurred.

The Attorney General likewise does not argue that defendant's invocation was only a qualified one, foreclosing only a limited area of further interrogation. (See *Connecticut* v. *Barrett* (1987) 479 U.S. 523 [93 L.Ed.2d 920, 107 S.Ct. 828].)

which is apparently how it viewed the failure to give the requisite admonishments to Elstad—were equated with "noncoercive" *Miranda* violations (see *id*. at pp. 307, fn. 1, 308, 310, 312, 315 [84 L.Ed.2d at pp. 230, 232-233, 234, 236]). Improprieties of this nature call into operation familiar principles. "Failure to administer *Miranda* warnings creates a presumption of compulsion . . . requiring suppression of all unwarned statements." (*Id*. at p. 307 [84 L.Ed.2d at pp. 230-231] [text & fn. 1].) With this said, qualifications were then noted. "The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." (*Id*. at p. 310 [84 L.Ed.2d at p. 233].) The presumption also "does not require that the statements and their fruits be discarded as inherently tainted." (*Id*. at p. 307 [84 L.Ed.2d at p. 231].)

But statements elicited by coercion are an altogether different matter. The court acknowledged that "[i]f errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, *unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will*, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Oregon* v. *Elstad, supra*, 470 U.S. 298 at p. 309 [84 L.Ed.2d at p. 232] [italics added].) Yet the court made clear that it was not relaxing its longstanding refusal to "condone inherently coercive police tactics or methods offensive to due process that render the initial admission involuntary and undermine the suspect's will to invoke his rights once they are read to him."[5] (*Id*. at p. 317 [84 L.Ed.2d at p. 237].) A "coercive *Miranda* violation"

[5] By its use of the term "voluntary" the court in *Elstad* was incorporating that substantial body of pre-*Miranda* case law that considered whether "an accused's in-custody statements . . . were 'voluntary' within the meaning of the Due Process Clause." (*Oregon* v. *Elstad, supra*, 470 U.S. 298 at p. 304 [84 L.Ed.2d at p. 229].) Until 1964 the court held to the view that it was the due process clause of the Fourteenth Amendment, not the self-incrimination clause of the Fifth Amendment, which prevented the admission of coerced statements and confessions in state courts. (See *Michigan* v. *Tucker, supra*, 417 U.S. 433 at pp. 440-441 [41 L.Ed.2d at pp. 190-191]; *Brown* v. *Mississippi* (1936) 297 U.S. 278, 285-286 [80 L.Ed. 682, 686-687, 56 S.Ct. 461].) But two years before *Miranda*, recognizing that the Fifth Amendment privilege against self-incrimination was the "essential mainstay" of "the American system of criminal prosecution," the court reversed course to hold that henceforth "The Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to

involving "actual infringement of the suspect's constitutional rights" activates the auxiliary exclusionary rule of *Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407]. (*Oregon* v. *Elstad, supra,* at pp. 305-309, 312-314 [84 L.Ed.2d at pp. 229-232, 234-236].)

*Elstad* was not one of those "cases . . . concerning suspects whose invocation of their rights to remain silent . . . were flatly ignored while police subjected them to continued interrogation." (*Oregon* v. *Elstad, supra,* 470 U.S. 298 at p. 313, fn. 3 [84 L.Ed.2d at p. 235].) ■ Unfortunately, the present case is one of those cases. Defendant insisted repeatedly, and in terms Officers Breuker and Kincannon could not fail to understand, that he did not want to talk about what had happened that night. The Attorney General makes no attempt to argue that defendant's " 'right to cut off questioning' was 'scrupulously honored.' " (*Michigan* v. *Mosley, supra,* 423 U.S. 96 at p. 104 [46 L.Ed.2d at p. 321].) The operative question is whether defendant was subjected to coercion within the meaning of the Fifth and Fourteenth Amendments. Based on our independent review of the uncontradicted evidence, we have no doubt that he was.

Admittedly, defendant was not subjected to overt physical brutality. This absence is not dispositive, for "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 206 [4 L.Ed.2d 242, 247, 80 S.Ct. 274].) ■ "No single litmus-paper test for constitutionally impermissible interrogation has been evolved. [¶] . . . The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. [Citation.] The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." (*Culombe* v. *Connecticut* (1961) 367 U.S. 568, 601-602 [6 L.Ed.2d 1037, 1057-1058, 81 S.Ct. 1860].) "In resolving the issue all the circumstances attendant upon the confession must be taken into account" (*Reck* v. *Pate* (1961) 367 U.S. 433, 440 [6 L.Ed.2d 948, 953, 81 S.Ct. 1541]) from an examination of the entire record. (*Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898-899, 86 S.Ct. 1761].)

speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 7-8 [12 L.Ed.2d 653, 659, 84 S.Ct. 1489].)

It thus appears that statements elicited by state law enforcement officers through coercion violate both the Fifth Amendment and the Fourteenth Amendment (and quite possibly *Miranda* as well). Certain of the *Elstad* excerpts quoted above reflect this overlap.

"If the individual desires to exercise his privilege [to remain silent], he has the right to do so. This is not for the authorities to decide." (*Miranda* v. *Arizona, supra,* 384 U.S. 436 at p. 480 [16 L.Ed.2d at p. 727].) It would be difficult to imagine a more egregious example of law enforcement authorities arrogating to themselves the exclusive power to decide whether a constitutional right would have more than a purely theoretical existence. No tolerance can be given to the officers' flagrant trampling of defendant's rights, particularly because Officers Breuker and Kincannon began the interrogation with no intention of respecting those rights.[6] Following the point at which defendant first invoked his right to silence, at least 10 additional invocations were made by defendant and ignored by his interrogators. Disrespect of the right is indicative of coercion: "Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." (*Miranda* v. *Arizona, supra,* at p. 474 [16 L.Ed.2d at p. 723].) Officer Kincannon aggravated the situation by using their common religion to conjure up in defendant's mind the picture of confessing to avoid going to hell ("if you don't talk . . . you are going . . . to fall"). "[A] state law enforcement officer conducting an interrogation of one accused of crime may not use his own or the suspect's personal religious beliefs as a tool to extract admissions of guilt. . . . [¶] Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say. The right to worship without fear is too precious a freedom for us to tolerate an invasion and manipulation by state officials of the religious beliefs of individuals, including those accused of crime." (*People* v. *Adams* (1983) 143 Cal.App.3d 970, 992, fn. 22, 989 [192 Cal.Rptr. 290]; *see People* v. *Kelly, supra,* 51 Cal.3d 931 at p. 953; cf. *Brewer* v. *Williams* (1977) 430 U.S. 387 [51 L.Ed.2d 424, 97 S.Ct. 1232].) These tactics constituted "deliberate means calculated to break the suspect's will." (*Oregon* v. *Elstad, supra,* 470 U.S. 298 at p. 312 [84 L.Ed.2d at 234].)

 These tactics succeeded because the officers were not employing them on a person who had a history of experience with police interrogation or on someone who in the circumstances would have unlimited powers of

---

[6]This conclusion is based on Officer Breuker's testimony at the hearing conducted on defendant's suppression motion:

"Q. Did the two of you [i.e., Officers Breuker and Kincannon] discuss the possibility that you had violated Mr. Montano's *Miranda* rights by continuing to talk to him after he had said he didn't want to speak to you any further?

"A. Indeed, we did that going into it.

"Q. Going into what?

"A. The interview.

"Q. The second interview or [the] first?

"A. The first."

resistance. At the time of the interrogation defendant was 18 years old, having entered the country illegally 8 months before. Defendant was sporadically employed as a menial worker in restaurants. When he reported for work on the day of the murder, he was sent away because, "I was too drunk."[7] (It was stipulated at trial that on the night of the murder defendant had a blood-alcohol level of .11 at 1:48 a.m., i.e., after he was arrested but a little more than two hours before the first interrogation). Before he left Mexico defendant graduated from the equivalent of junior high school. His command of English is far from perfect. It is a reasonable inference that the interrogation was a novel experience for him.

Defendant was thus confronting nothing like a level playing field. He "was alone in the hands of the police, with no one to advise or aid him." (*Haynes* v. *Washington* (1963) 373 U.S. 503, 514 [10 L.Ed.2d 513, 521, 83 S.Ct. 1336].) It soon became apparent to him that his attempts to halt the questioning, using the right he was told was his, were a waste of time because the officers were not going to respect his invocation of that right. Again and again defendant told the officers that he did not wish to speak to them, to no avail. Each time defendant stated he did not wish to speak further, the officers ostensibly agreed to talk about other matters, but they soon resumed questioning him about aspects of the incident. The officers' conduct conveyed the unmistakable message that defendant's rights were meaningless. Faced with this "callous attitude of the police towards his rights" (*Haley* v. *Ohio* (1948) 332 U.S. 596, 600-601 [92 L.Ed. 224, 229, 68 S.Ct. 302]), defendant could not help but believe that "the police wanted answers and were determined to get them." (*Culombe* v. *Connecticut, supra,* 367 U.S. 568 at p. 625 [6 L.Ed.2d at p. 1071].) Hung over, his pleas of fatigue and lack of sleep ignored, held in a police station in the dead of night (see *Clewis* v. *Texas* (1967) 386 U.S. 707, 712 [18 L.Ed.2d 423, 428, 87 S.Ct. 1338]), defendant confronted inquisitors bent on denying him any respite and exploiting his obvious emotional turmoil. ("I can see the tears in your eyes. I know what happened tonight made you very, very bad feeling. Okay, feel bad about that. I know it's in your mouth. What you want to tell me is right in your mouth. It just needs a little pushing to get it out.") Near the end of the session Officer Kincannon made it clear that defendant would undergo further interrogation. ("The other officers want to talk. What are we going to do when they come? . . . Bruce [Officer Breuker] wants to talk to you a little bit more.") The recurring themes of the interrogation were the officers pressing defendant to (1) overcome his refusal to talk about aspects of the crime, and (2) agree to talk at a later time. As the relentless questioning continued, defendant would have "had every reason to expect

---

[7] It appears that defendant has tuberculosis, although whether he knew it at the time of the interrogation is a matter of speculation.

that his . . . interrogators intended to keep the pace up till he broke." (*Culombe* v. *Connecticut, supra,* at p. 624 [6 L.Ed.2d at p. 1070].) In these circumstances it would be the rare suspect whose "capacity for self-determination" would not be "critically impaired." (*Id.* at p. 602 [6. L.Ed.2d at pp. 1057-1058].)

Defendant was not that rare suspect. Before he invoked his right to remain silent, defendant had admitted only that he had been carrying a knife; that he had been running when he was stopped by police; and that he had a "serious problem." He would not admit that he had met any woman, much less the victim. By the time the interrogation ended, defendant had admitted that he was alone when "this bad thing happened"; that he thought he would be "in jail for a long time" because of the "problem" he had; that he had committed an "error" that night; that he knew what had happened; and that he had met the victim. And by shaking his head just after being told of the victim's death and being asked whether there was another person the police should be looking for, defendant tacitly admitted that he alone was responsible for the victim's murder. Viewed in their totality, defendant's admissions amounted to an inculpatory statement tantamount to a confession. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 230 [142 Cal.Rptr. 163, 571 P.2d 620]; Evid. Code, §§ 135, 225.) The means by which the statement was obtained—"inherently coercive police tactics[,] methods offensive to due process," and direct "police infringement of the Fifth Amendment itself" (*Oregon* v. *Elstad, supra,* 470 U.S. 298 at pp. 317, 369 [84 L.Ed.2d at pp.237, 271])—taint it as constitutionally involuntary. (See fn. 5, *ante.*)

The next question is whether the actual confession admitted at defendant's trial was obtained by exploitation of the illegality of the initial interrogation. Because the predicate illegality was of constitutional magnitude, the prosecution had to show that defendant's confession "was sufficiently an act of free will to purge the primary taint" (*Wong Sun* v. *United States, supra,* 371 U.S. 471 at p. 486 [9 L.Ed.2d at p. 454]), or, phrased differently, that the connection between the first interrogation and the confession "had 'become so attenuated as to dissipate the taint.' " (*Id.* at p. 491 [citing and quoting *Nardone* v. *United States* (1939) 308 U.S. 338, 341 (84 L.Ed. 307, 60 S.Ct. 266)]; see *Rawlings* v. *Kentucky* (1980) 448 U.S. 98, 106-107 [65 L.Ed.2d 633, 642-643, 100 S.Ct. 2556]; *Dunaway* v. *New York* (1979) 442 U.S. 200, 216-218 [60 L.Ed.2d 824, 838-840, 99 S.Ct. 2248]; *Brown* v. *Illinois* (1975) 422 U.S. 590, 597-600, 603-604 [45 L.Ed.2d 416, 423-425, 426-428, 95 S.Ct. 2254].) "The question whether a confession is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive . . . . *Miranda* warnings are an important factor, to be sure, in determining whether the confession is ob-

tained by exploitation of [the illegality]. But they are not the only factor to be considered. The temporal proximity of the [illegality] and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct, are all relevant." (*Brown* v. *Illinois, supra,* at pp. 603-604 [45 L.Ed.2d at p. 427] [citation and fns. omitted].) Speaking to the precise situation presented here, the court in *Elstad* indicated that "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." (*Oregon* v. *Elstad, supra,* 470 U.S. 298 at p. 310 [84 L.Ed.2d at pp. 232-233].)

The importance of *Miranda* warnings appears to depend on the nature of the underlying violation. If what *Elstad* termed a "technical" or "procedural" *Miranda* violation is all that is involved, the curative powers of the warnings are potent. (See *Oregon* v. *Elstad, supra,* 470 U.S. 298 at pp. 310-311, 314 [84 L.Ed.2d at pp. 232-234].) But the same "coercive police tactics . . . that render the initial admission involuntary [also] undermine the suspect's will to invoke his rights once they are read to him" (*id.* at p. 317 [84 L.Ed.2d at p. 237]) at a subsequent interrogation. The second set of *Miranda* warnings administered to defendant would thus have minimal effect. Having already seen that his earlier attempts to invoke one of the rights that the warnings told him he had were repeatedly ignored, there would be no basis for defendant to believe the same interrogators would act any differently the second time around.

The factor of temporal proximity between the coercion and the confession is only slightly less favorable to defendant. When the first interrogation terminated at approximately 5:30 a.m., his prospects were bleak. The first interrogation had concluded with defendant in effect admitting that he was the murderer. Reflecting on this, defendant could not but conclude that he had thereby "let the cat [of his guilt] out of the bag." (*United States* v. *Bayer* (1947) 331 U.S. 532, 540 [91 L.Ed. 1654, 1660, 67 S.Ct. 1394].) The existence of defendant's first statement "is of course vitally relevant to the voluntariness of [his] later statements." (*Beecher* v. *Alabama* (1967) 389 U.S. 35, 36, fn. 2 [19 L.Ed.2d 35, 38, 88 S.Ct. 189].) Among "the psychological and practical disadvantages" (*United States* v. *Bayer, supra,* at p. 540 [91 L.Ed. at p. 1660]) under which defendant labored was the awareness that the process of his interrogation was not at an end, but had only reached a pause. Defendant could have no doubt that further questioning was in store for him, with the officers certain to press for a complete confession that filled in the gaps left by the damaging admissions he had already made. Defendant's summons to Officer Breuker, less than five hours after they parted, was nothing more than a surrender to the inevitable.

It is only "the presence of intervening circumstances" (*Brown* v. *Illinois, supra,* 422 U.S. 590 at p. 603-604 [45 L.Ed.2d at p. 427]) that appears to work against defendant. Not surprisingly, it is here that the Attorney General makes his last stand. The fact that it was defendant who summoned Officer Breuker for the confession is undeniable. On the other hand, defendant remained in the inherently coercive atmosphere of the police station. If anything, the fact that after the first interrogation session defendant had been booked and put in a jail cell could only have increased his feelings of helplessness in that "strictest of custodial conditions." (*Rawlings* v. *Kentucky, supra,* 448 U.S. 98 at p. 107 [65 L.Ed.2d at p. 643].) There is no evidence that he consulted friends, relatives, or an attorney. He was in effect left to stew in his own juices and ponder the hopelessness of his situation in light of what he had already admitted. It is clear that during that period Officer Kincannon's manipulation of defendant's religious feelings bore the desired fruit. Officer Kincannon had told defendant to "talk to us about this problem" as "one of the basic steps of repentance," without which defendant would "fall." Defendant began his confession by announcing to Officer Kincannon that "at no time have I stopped repenting what I did." This demonstrates that the ensuing confession was "a direct and obvious response to the interrogative techniques used . . . during the earlier illegal interview." (*People* v. *Boyer, supra,* 48 Cal.3d 247 at pp. 269-270.) ██ ██ ██ Based on the circumstances detailed above, the psychologically coercive illegalities of the first interrogation were the motivating causes of the damaging admissions, and of the subsequent confession. (See *Hutto* v. *Ross* (1976) 429 U.S. 28, 30 [50 L.Ed.2d 194, 197, 97 S.Ct. 202]; *People* v. *Kelly, supra,* 51 Cal.3d 931 at pp. 952-953.)[8]

 Finally, "the purpose and flagrancy of the official misconduct" (*Brown* v. *Illinois, supra,* 422 U.S. 590 at p. 604 [45 L.Ed.2d at p. 427]) are totally in defendant's favor. That "[t]he illegality here . . . had a quality of purposefulness" (*id.* at p. 605 [45 L.Ed.2d at p. 428]) cannot be denied. That its purpose was intended to reduce defendant's resistance to the interrogating officers' desire for a confession is likewise beyond dispute. That purpose was effected by a persistent disregard of defendant's constitutional right to remain silent and not incriminate himself. With respect to flagrancy, this is a glaring example of police misconduct.

---

[8] "Involuntary confessions, of course, may be given . . . subsequently to unlawful pressures . . . . The question of whether those confessions subsequently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. . . . [¶] The admissibility of the later confession depends upon the same test—is it voluntary. Of course the fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary." (*Lyons* v. *Oklahoma* (1944) 322 U.S. 596, 602-603 [88 L.Ed. 1481, 1485-1486, 64 S.Ct. 1208].) This is such a case.

██ When applying *Wong Sun*, "considerations relating to the exclusionary rule and the constitutional principles which it is designed to protect must play a factor in the attenuation analysis . . . . The penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve." (*United States* v. *Ceccolini* (1978) 435 U.S. 268, 279 [55 L.Ed.2d 268, 279, 98 S.Ct. 1054].) The supporting rationales of the *Wong Sun* rule excluding derivative evidence are "the general goal of deterring improper police conduct [and] the Fifth Amendment goal of assuring trustworthy evidence." (*Oregon* v. *Elstad, supra*, 470 U.S. 298 at p. 308 [84 L.Ed.2d at pp. 231-232].) ██ "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused." (*Michigan* v. *Tucker, supra*, 417 U.S. 433 at p. 447 [41 L.Ed.2d at p. 194].) " 'Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' " (*Id.* at p. 446 [41 L.Ed.2d at p. 194] [citing and quoting *Elkins* v. *United States* (1960) 364 U.S. 206, 217 (4 L.Ed.2d 1669, 1677-1678, 80 S.Ct. 1437)].)

██ Coerced confessions are excluded as evidence because they are inherently untrustworthy (see e.g., *Spano* v. *New York* (1959) 360 U.S. 315, 320 [3 L.Ed.2d 1265, 1269-1270, 79 S.Ct. 1202]; *Stein* v. *New York* (1953) 346 U.S. 156, 192 [97 L.Ed. 1522, 1546-1547, 73 S.Ct. 1077]; *Lyons* v. *Oklahoma, supra*, 322 U.S. 596 at p. 605 [88 L.Ed. at p. 1487]), and because their use degrades our system of justice. (See *Escobedo* v. *Illinois* (1964) 378 U.S. 478, 488-490 [12 L.Ed.2d 977, 984-986, 84 S.Ct. 1758].) ██ As has been shown, defendant was subjected to wilful conduct that overrode his attempts to claim the protection of an undoubted constitutional right. The sole purpose for the officers' misconduct was to secure an incriminating statement. With a nexus so obvious, exclusion is clearly in order: "When there is a close causal connection between the illegal[ity] and the confession, not only is exclusion of the evidence more likely to deter similar police misconduct in the future, but use of the evidence is more likely to compromise the integrity of the courts." (*Dunaway* v. *New York, supra*, 442 U.S. 200 at p. 218 [60 L.Ed.2d at p. 839].)

It thus appears that of the attenuation factors identified in *Brown* v. *Illinois* all support application of the *Wong Sun* exclusionary rule. The additional considerations of producing trustworthy evidence and promoting deterrence also call for exclusion of a confession obtained as the direct

result of "coercion [and] . . . other deliberate means calculated to break the suspect's will." (*Oregon* v. *Elstad, supra,* 470 U.S. 298 at p. 312 [84 L.Ed.2d at p. 234].) We therefore conclude that defendant's suppression motion should have been granted in its entirety. ▇▇ ▇▇ ▇▇ ▇▇ In light of the fact that the confession was admitted at defendant's trial, the judgment must be reversed. (See *Rose* v. *Clark* (1986) 478 U.S. 570, 577 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101]; *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065] [text & fn. 8]; *Payne* v. *Arkansas* (1958) 356 U.S. 560, 568 [2 L.Ed.2d 975, 981, 78 S.Ct. 844].)[9]

II*

. . . . . . . . . . . . . . . . . . . .

The judgment of conviction is reversed.

Anderson, P. J., and Perley, J., concurred.

---

[9] "[A] defendant's compelled statements, as opposed to statements taken in violation of *Miranda,* may not be put to any testimonial use whatever against him in a criminal trial. 'But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law.' " (*New Jersey* v. *Portash* (1979) 440 U.S. 450, 459 [59 L.Ed.2d 501, 510, 99 S.Ct. 1292] [citing and quoting *Mincey* v. *Arizona* (1978) 437 U.S. 385, 398 [57 L.Ed.2d 290, 303, 98 S.Ct. 2408] (original italics)].) It was therefore improper for defendant to be impeached with evidence of a statement he made at the first interrogation after he had invoked his right to remain silent.

*See footnote, *ante,* page 914.