Filed 12/11/25  P. v. Veliz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B335528 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA098201) |
| v. | |
| CHRISTIAN FRANCISCO VELIZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelly M. Kelley, Judge.  Affirmed.

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield and Lindsay Boyd, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christian Veliz (appellant) of two murders he committed when he was 18 years old. He was sentenced to life in prison without the possibility of parole (LWOP). He argues the trial court erred in admitting statements he made to undercover agents during a *Perkins*[1] operation and in instructing the jury on the failure to explain or deny incriminating evidence (CALCRIM No. 361). He also contends that his sentence is cruel and unusual punishment. We reject these contentions and affirm.

**FACTS AND PROCEDURAL BACKGROUND**

1. **Facts**

Appellant was born in Guatemala, but moved to the United States when he was young. He met Saul Reyes (Reyes) and Christian Martinez (Martinez) through his male cousin who dated Reyes before eventually moving out of state. Appellant and Reyes became friends, and when appellant was 17 years old, he worked in Reyes's sunglasses shop.

At some point, appellant borrowed $700 from Reyes. Reyes then contacted him repeatedly to repay the loan or to have sex with him in lieu of repayment. Appellant did not want to have sex with Reyes, and had a girlfriend at the time. According to appellant, Reyes drugged him at a party one time and had sex with him while he was incapacitated.

On the evening of April 29, 2018, appellant was cooking at the home he shared with his female cousin and his girlfriend. Around 10:00 p.m., he went outside to meet Reyes and Martinez who were sitting in a car. After appellant got into the car, he shot Reyes and Martinez in the head several times each and slit their throats with a box cutter. Appellant took their cell phones,

---

[1] *Illinois v. Perkins* (1990) 496 U.S. 292 [110 S.Ct. 2394].

returned home, washed up, and disposed of his bloody clothes in the dumpster outside of his apartment building.

## 2.     Procedural background

On June 5, 2019, appellant was charged by information with two counts of murder (Pen. Code, § 187, subd. (a)).[2]  He was further charged with personal use of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and use of a deadly and dangerous weapon—a box cutter (§ 12022, subd. (b)(1)).

The matter proceeded to trial, and the jury convicted him on both counts and found true both enhancements.

## DISCUSSION

## 1.     The *Perkins* operation[3]

After appellant's arrest, he was placed in a cell with two undercover agents.  He told the first agent that he reads the Bible and asked whether the agent wanted to read the Bible with him.  Appellant eventually began reading from it, and he and the agent took turns reading chapters.  Appellant preached and recited a prayer.

At some point, the second *Perkins* agent entered the cell, and he and appellant discussed their jobs and the reason for appellant's arrest.  The agent then told appellant, "Look, don't

---

[2] Undesignated statutory references are to the Penal Code.

[3] The record contains only part of the transcript from the *Perkins* operation, which was apparently provided in full to the trial court, along with a video recording of the operation also not in the record on appeal.  Some missing portions of the transcript were recited and summarized by appellant in his motion to exclude and by the trial court at the hearing on the motion, and the parties do not appear to dispute the accuracy of those depictions.

3

start feeling down, fool. . . . You gotta have faith." Appellant said that he did have faith, and the agent referred to a part in the Bible about a burning pit. He then said to appellant, "Sometimes God calls on you. . . . Sometimes he knocks on the door and we're blind to it. . . . We don't wanna listen. Sometimes things happen and like the Bible says, God calls on whomever He wants. You know?" Appellant responded, "Exactly." The agent continued, "Sometimes when stuff like this happens, you have to come and use your head and repent for anything you've done wrong. You know? God is great and He can help you. . . . God is one thing and God is with you, 'cause, look, Peter used to be this huge murderer, you know? And what did Peter do? He gave his life for God, right?" Appellant replied, "Of course." The agent went on, "But don't let the world fuck you either. You know? You have to use your head. Sometimes life is cruel, but . . . [e]verything has a solution." Appellant stated that he knew he was going to get out because he had not done anything wrong. The agent and appellant discussed Bible songs and verses, and then the agent shared general information about criminal proceedings. The agent eventually said something to the effect of "everything is in God's hands." Shortly thereafter, without any intervening discussion of religion, appellant made statements showing his guilt. An agent asked appellant, "[W]hy did you do it?" And appellant responded, "The dude fucking bugged me a lot. He was gay. . . . He would harass me a lot." He also said he took the victims' cell phones and threw his clothes away.

The People sought to introduce these statements, and appellant moved to exclude them because they "were not a product of a rational intellect and a free will." After reviewing the *Perkins* operation in its entirety, the trial court found under

4

the totality of the circumstances that appellant's statements were voluntary and allowed them to be introduced. Specifically, the court found, having "watched the video, the tone, cadence, body language, and dynamics of the interaction," that appellant was comfortable with the agents, whom he believed to be fellow inmates, and that none of his statements to them were coerced. The court further noted that it was appellant who raised the topic of religion, and he continued to raise it repeatedly during the operation.

**2. The trial court did not err in admitting appellant's statements to the *Perkins* agents**

Appellant argues that the trial court's refusal to suppress his confession violated his due process rights because the confession was involuntary. "An involuntary confession may not be introduced into evidence at trial." (*People v. Carrington* (2009) 47 Cal.4th 145, 169 (*Carrington*); *Lego v. Twomey* (1972) 404 U.S. 477, 483 [92 S.Ct. 619].) The test for determining whether a confession is voluntary is whether, under the totality of the circumstances, the defendant's will was overborne when he confessed. (*People v. Fayed* (2020) 9 Cal.5th 147, 165; *People v. Orozco* (2019) 32 Cal.App.5th 802, 818.) We independently review the trial court's voluntariness finding, while accepting its findings with respect to the circumstances surrounding the confession if supported by substantial evidence. (*People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1250.)

Appellant did not provide the video and audio recording or the full transcript of the *Perkins* operation, which are pieces of evidence the trial court relied on in making its determination. Based on the limited record before us, we agree with the trial court that appellant's confession was voluntary. (See *People v.*

5

*Malabag* (1997) 51 Cal.App.4th 1419, 1422 [all presumptions are indulged to support the trial court's determinations where the record is silent].) Although the *Perkins* agents connected with appellant by discussing religion, nothing suggests that the agents used religion to overcome his will. (See *People v. Kelly* (1990) 51 Cal.3d 931, 951–953 [appeals to the defendant's religious upbringing and questions about belief in Jesus and about going to heaven were not "so coercive as to overcome [his] free will"].) Indeed, it was appellant who repeatedly raised the topic of religion and suggested the agents read from the Bible. Nor does the record does show that any appeals to religion immediately preceded appellant's incriminating statements. Rather, his statements showing guilt were preceded by the agent telling appellant, "I just want to give you assistance about how you can work your case," and "[s]ometimes one makes mistakes but that doesn't mean that you're a bad person." Appellant's behavior showed that he trusted and was comfortable with the *Perkins* agents when he confessed, not that he was coerced by them, by appeals to religion or otherwise. (See *People v. Williams* (2010) 49 Cal.4th 405, 443 [" ' "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable" ' "].)

Appellant relies on *People v. Montano* (1991) 226 Cal.App.3d 914 to argue that his confession was involuntary, but that case is readily distinguishable. There, officers repeatedly refused to honor the defendant's attempts to invoke his right to remain silent. (*Id.* at p. 920.) After "numerous futile efforts at terminating the interrogation, [the] defendant made an admission so damaging as to be tantamount to a confession."

(*Ibid*.)  The *Montano* court concluded that "the officers' flagrant trampling of [the] defendant's rights," paired with their "conjur[ing] up . . . the picture of . . . going to hell" if he did not confess, constituted " 'deliberate means calculated to break the [defendant's] will.' "  (*Id*. at p. 935.)  Here, on the other hand, there was no interrogation, and no flagrant trampling of anyone's rights.  Appellant was unaware that the men in his cell were law enforcement agents, instead believing them to be fellow inmates in whom he could confide.  He therefore made no attempts to invoke his right to remain silent, and nothing in the record shows the agents employed any means designed to break his will.

*People v. Adams* (1983) 143 Cal.App.3d 970, which appellant also cites, is also distinguishable.  In that case, the interrogating sheriff had known the defendant for several years from having attended the same church, and the defendant "regarded him as a friend."  (*Id*. at p. 986.)  The sheriff also knew that the defendant was "particularly vulnerable" because she "was ill and had guilt[y] feelings."  (*Id*. at pp. 986, 989.)  While he interrogated her, "she was emotional and anxious, with facial expressions 'just short of crying.' "  (*Id*. at p. 985.)  In this context, the *Adams* court concluded that the sheriff's repeated references to "sin" and "guilt," along with his suggestion that "she was a candidate for a nervous breakdown because she would not tell the truth," induced an involuntary confession.  (*Id*. at pp. 988–990.)  Here, however, appellant had no preexisting friendship or familiarity with the agents.  Nor was he aware that they were acting at the behest of law enforcement.  Nothing in the record suggests the agents exploited any particular vulnerability they knew appellant to have.  They followed appellant's lead in framing their discussion around religion.  In short, the

7

circumstances here were entirely different from those in *Adams*, and we are unpersuaded that the agents' appeal to religion rendered appellant's subsequent confession involuntary.

Finally, appellant points to the lack of advisement he received about his right to consular notification to show his confession was involuntary. This lack of advisement does not change our analysis. Article 36 of the Vienna Convention on Consular Relations requires law enforcement officials to inform arrested foreign nationals of their right to have their consulate notified of their arrest. (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. 331, 349 [126 S.Ct. 2669] (*Sanchez-Llamas*); *People v. Enraca* (2012) 53 Cal.4th 735, 756 (*Enraca*).) Suppression of coerced confessions is required " 'because we disapprove of such coercion and because such confessions tend to be unreliable.' " (*Enraca*, at p. 757.) A violation of article 36 is unlikely to produce unreliable confessions; nor are police likely to win any practical advantage from such a violation. (*Ibid*.; see *Sanchez-Llamas*, at p. 349 [article 36 "has nothing whatsoever to do with searches or interrogations," and there will generally be "little connection between [such a] violation and evidence or statements obtained by police"].) Although appellant is correct that "[a] consular notification claim may be raised as part of a broader challenge to the voluntariness of a confession," here, in the absence of any showing of coercion, "[s]uppression would be a vastly disproportionate remedy for an Article 36 violation." (*Sanchez-Llamas*, at pp. 349, 350.)

3. **The trial court properly instructed the jury with CALCRIM No. 361**

Appellant argues that the trial court erred in giving the following instruction: "If the defendant failed in his testimony to

explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating the evidence" (CALCRIM. No. 361).[4] "We independently review the propriety of a jury instruction." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 199.)

Appellant's testimony provided a basis for instructing the jury with CALCRIM No. 361. He did not dispute that he had killed Reyes and Martinez, instead urging that he was acting in self-defense. He testified that he shot each of them because he was scared, but stated that he did not remember the part where he slit their throats with the boxcutter. Appellant could reasonably be expected to know why or how he slit his victims' throats, or at least the fact that it occurred. His failure to explain that evidence was a proper basis for the jury instruction. (Cf. *People v. Barrett* (2025) 17 Cal.5th 897, 990–991 (*Barrett*) [similar instruction was proper where the defendant admitted to cutting a weapon out of his desk, but responded, "I don't recall," to question about how he did it].)

Even were it error to give this instruction, there is no reasonable probability that it affected the outcome, particularly given the instruction's admonition that a defendant's failure to explain "is not enough by itself to prove guilt" (CALCRIM No. 361), and the further instruction given that "[s]ome of these instructions may not apply," and that the jury must "follow the

---

[4] The instruction further provides: "Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure." (CALCRIM No. 361.)

instructions that do apply to the facts as you find them" (CALCRIM No. 200). (*Barrett, supra,* 17 Cal.5th at p. 993; *People v. Saddler* (1979) 24 Cal.3d 671, 683.)[5]

## 4. Appellant's LWOP sentence is not cruel and/or unusual punishment

Both the federal prohibition on "cruel *and* unusual punishment" contained in the Eighth Amendment and the state prohibition on "cruel *or* unusual punishment" enshrined in our Constitution (Cal. Const., art. I, § 17, italics added) bar sentences that are "grossly disproportionate" to the crime or so disproportionate " ' " ' "that it shocks the conscience and offends fundamental notions of human dignity." ' " ' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179]; *People v. Boyce* (2014) 59 Cal.4th 672, 719.) Applying this principle, our Supreme Court held in *People v. Flores* (2020) 9 Cal.5th 371, 429, that a death sentence was not unconstitutionally disproportionate for a homicide committed by 18- to 21-year-olds. If a death sentence for young adults in this age range is not disproportionate, then neither is a sentence of LWOP. (Accord, *In re Williams* (2020) 57 Cal.App.5th 427, 439; *People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482.)

---

[5] Because we have found no error, we necessarily reject appellant's claim of cumulative error.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED.


LUI, P. J.


We concur:


RICHARDSON, J.


SIGGINS, J.*

---

&ast; Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11