98 F.3d 402
 96 Cal. Daily Op. Serv. 6651, 96 Daily Journal
D.A.R. 10,869,
96 Daily Journal D.A.R. 13,022
UNITED STATES of America, Plaintiff-Appellee,
v.
Jacob Harold SHERWOOD, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ray Marion CUDDY, Defendant-Appellant.
 Nos. 94-10425, 94-10459.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 14, 1995.
Decided Sept. 5, 1996.
As Amended Oct. 28, 1996.
 
 1
 Daniel J. Albregts and Mitchell Posin, Las Vegas, Nevada, for defendants-appellants.
 
 
 2
 Joseph M. Angelo, Camille W. Damm and Thomas M. O'Connell, Assistant United States Attorneys, Las Vegas, Nevada, for plaintiff-appellee.
 
 
 3
 Appeals from the United States District Court for the District of Nevada, Lloyd D. George, Chief District Judge, Presiding. D.C. No. CR-93-00219-LDG.
 
 
 4
 Before: KOZINSKI and HAWKINS, Circuit Judges, and SILVER,* District Judge.
 
 
 5
 Opinion by Judge SILVER; Concurrence by Judge HAWKINS; Dissent by Judge KOZINSKI.
 
 SILVER, District Judge:
 BACKGROUND
 
 6
 On July 26, 1993, Kevin Wynn, the daughter of Steven Wynn, the Chief Executive Officer of Mirage Resorts, Inc., was confronted by two kidnappers in her Las Vegas townhouse. Ms. Wynn's kidnappers taped her eyes shut, put sunglasses on her, and made her remove her clothes, except her underwear. Ms. Wynn was then forced to pose for pictures, which her kidnappers stated would be publicly disseminated should she or her father go to the police. Ms. Wynn was then allowed to get dressed, was put in her car, and was driven to the airport, where she was left tied up. The kidnappers called Mr. Wynn and demanded $1.45 million for Ms. Wynn's return. The ransom was paid with money from the Mirage Hotel & Casino. Upon payment of the ransom, Ms. Wynn was recovered.
 
 
 7
 On December 8, 1993, a second superseding indictment was filed charging Jacob Harold Sherwood, Ray Marion Cuddy, and Anthony Watkins with (1) Conspiracy in violation of 18 U.S.C. § 1951; (2) Interference with Commerce by Threats or Violence in violation of 18 U.S.C. § 1951; (3) Use of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(C) AND (4)[1] two counts of Aiding and Abetting in violation of 18 U.S.C. § 2. Cuddy was also charged with Laundering Monetary Instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (ii), and Sherwood and Watkins were charged with Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (ii). Watkins entered into a cooperation agreement with the government. Sherwood and Cuddy went to trial and were tried together. Watkins was the government's key witness. On May 12, 1994, Sherwood and Cuddy were convicted on all counts.
 
 
 8
 Sherwood was sentenced on August 9, 1994, to one hundred sixty-eight months on counts one, two and five, to be served concurrently, and sixty months on count three, to run consecutively with the other sentences, for a total of two hundred twenty-eight months. Cuddy was sentenced on September 2, 1994, to two hundred thirty-five months on counts one, two and four, to be served concurrently, and sixty months on count three, to run consecutively with the other sentences, for a total of two hundred ninety-five months.
 
 
 9
 Sherwood and Cuddy have timely appealed their convictions and sentences.
 
 DISCUSSION
 DEFENDANT SHERWOOD
 Voir dire
 
 10
 We review the district court's conduct of voir dire in this case for abuse of discretion. See United States v. Cutler, 806 F.2d 933, 936 (9th Cir.1986) (applying abuse of discretion standard where defendant contended that pretrial publicity required voir dire by counsel). Despite its earlier ruling denying Sherwood's request for attorney voir dire, the district court specifically allowed the attorneys to voir dire individual jurors at side bar regarding pretrial publicity. In doing so, the district court judge announced that he would not allow an abuse of the attorney voir dire at sidebar. Sherwood challenges the propriety of this statement, which he contends "chilled" his counsel. We find this statement to be perfectly appropriate and note that the record reveals that Sherwood's counsel took full advantage of the opportunity to voir dire the individual jurors. In addition, Sherwood's contention that the district judge "rehabilitated" the jurors, which stifled their ability to be open and honest, is unsupported by the record.
 
 
 11
 Finally, Sherwood's contention that his conviction must be reversed because he was not present during the attorney-conducted voir dire at sidebar, and therefore could not assist his attorney in deciding how his preemptory challenges should be used, must fail. Although a defendant charged with a felony has a fundamental right to be present during voir dire, this right may be waived. See Campbell v. Wood, 18 F.3d 662, 672-73 (9th Cir.1994) (en banc) (defendant in a capital case waived his right to be present during voir dire by expressing his desire not to be present). Under the circumstances of this case, Sherwood waived his right to be present by failing to indicate to the district court that he wished to be present at side bar.Daubert
 
 
 12
 Sherwood contends that the district court erred in admitting the testimony of Kenneth Dunn, a fingerprint expert, without engaging in the analysis set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Sherwood concedes that because he failed to make a specific objection to the expert testimony regarding the prints on the parking ticket, our review is limited to plain error analysis. United States v. Whitmore, 24 F.3d 32, 34 (9th Cir.1994). Therefore, we will only reverse if the district court committed a clear or obvious error that affected substantial rights or was prejudicial. Id. at 34-35.
 
 
 13
 We have read the Supreme Court's decision in Daubert as requiring the district court to determine whether the expert's testimony reflects "scientific knowledge derived by the scientific method" and whether his or her work product amounts to "good science." Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1315 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995). The district court must then determine whether "the proposed expert testimony is 'relevant to the task at hand,' " meaning that it logically advances a material aspect of the proponent's case. Id.
 
 
 14
 The following factors may be relevant to the above inquiry: whether the theory or technique the expert employs is generally accepted in the scientific community; whether it has been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable. Daubert, 509 U.S. at 591-93, 113 S.Ct. at 2796-97.
 
 
 15
 We consider these factors non-exhaustive and recognize that not every factor will be applicable in every case. Daubert, 43 F.3d at 1316-17. Sherwood admits that Dunn's technique is the generally-accepted technique for testing fingerprints and that fingerprint comparison has been subjected to peer review and publication. Furthermore, Sherwood admits that Dunn's testimony would aid the jury in determining the kidnappers' identity, thereby satisfying the second prong of the Daubert test. Consequently, the district court did not commit actual error in admitting Mr. Dunn's testimony.
 
 
 16
 Sherwood also contends that the district court erred in allowing the expert to specifically testify that he had no doubt that the prints on the parking stub were Sherwood's because the expert was testifying to the "ultimate issue" of whether it was Sherwood's print. This argument fails in light of Fed.R.Evid. 704, which permits expert testimony on the ultimate issue in a case.
 
 Sufficiency of the Evidence
 
 17
 There is sufficient evidence to support a conviction if, "viewing the evidence in the light most favorable to the government and respecting the jury's ability to judge the credibility of the witnesses, resolve factual conflicts, and draw inferences, a rational jury could have found the elements of the crime beyond a reasonable doubt." United States v. Feldman, 853 F.2d 648, 654 (9th Cir.1988), cert. denied, 506 U.S. 1082, 113 S.Ct. 1054, 122 L.Ed.2d 361 (1993). Sherwood contends that the sole issue for the jury at trial was the identity of the taller individual who kidnapped Kevin Wynn. Sherwood admits that if there was sufficient evidence to support a finding that he was that individual, then there was sufficient evidence to sustain a conviction against him on all four counts.
 
 
 18
 Sherwood's sole argument is that the credibility of the witnesses implicating him as the kidnapper was suspect. Even if a few of the government's witnesses were somewhat unbelievable, "[w]e 'must respect the exclusive province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts, by assuming that the jury resolved all such matters in a manner which supports the verdict.' " United States v. Gillock, 886 F.2d 220, 222 (9th Cir.1989) (quoting United States v. Ramos, 558 F.2d 545, 546 (9th Cir.1977)). Assuming the jury found the witnesses to be credible, there was more than enough evidence to support the jury's finding that Sherwood was one of the two kidnappers.
 
 
 19
 The strongest testimony came from Watkins, who testified that he had pled guilty to all counts of the indictment and that Sherwood and Cuddy participated in those crimes with him. Watkins provided extensive testimony detailing Sherwood's involvement in the crimes. Furthermore, there was evidence that Sherwood was in Las Vegas at the time of the kidnapping and that he returned from Las Vegas with Watkins. After he returned from Las Vegas, Sherwood gave one individual $20,000 for herself and $10,000 for her daughter. He also gave $10,000 to an individual named Victor and $10,000 to an individual named Charles. The money was given out in $100 denominations. Another witness testified that Sherwood told her that he and Watkins had kidnapped a woman for ransom.
 
 
 20
 Consequently, there was evidence from which a rational jury could have found beyond a reasonable doubt that Sherwood was one of the kidnappers.
 
 DEFENDANT CUDDY
 Severance
 
 21
 Cuddy has waived his right to appeal the district court's denial of his severance motion by failing to renew the motion at the close of evidence because Cuddy has failed to demonstrate that to renew the motion would have been an unnecessary formality, and he has otherwise failed to establish that he diligently pursued his motion. See United States v. Kaplan, 554 F.2d 958, 965 (9th Cir.) (waiver may be absent when a renewal at the close of evidence would constitute an unnecessary formality; the "[d]iligent pursuant of a severance motion is the guiding principle"), cert. denied, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).
 
 Suppression
 
 22
 We review de novo the district court's denial of a suppression motion. United States v. Moreno-Flores, 33 F.3d 1164, 1168 (9th Cir.1994). Whether a person is in custody and whether he was subjected to police interrogation are questions of fact reviewable under the clearly erroneous standard. United States v. Brady, 819 F.2d 884, 886 (9th Cir.1987), cert. denied, 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988). We also review the district court's voluntariness determination under the clearly erroneous standard. United States v. Allen, 699 F.2d 453 (9th Cir.1982). A district court's decision to admit evidence for impeachment purposes on cross-examination is reviewed for abuse of discretion. United States v. Perkins, 937 F.2d 1397, 1406 (9th Cir.1991).
 
 
 23
 The district court did not err in denying Cuddy's motion to suppress his statement "How did you find me so quickly?" The district court's finding that the statement was spontaneous and not the result of police questioning is not clearly erroneous. "Spontaneous" or "volunteered" confessions of a suspect in custody are admissible despite the absence of a prior Miranda warning. United States v. Booth, 669 F.2d 1231, 1237 (9th Cir.1981).
 
 
 24
 Because Cuddy did not take the stand, he is not entitled to review of the district court's ruling that other statements he made pursuant to custodial questioning could be used for impeachment. United States v. Behanna, 814 F.2d 1318 (9th Cir.1987).
 
 
 25
 Cuddy also contends the district court erred in denying his motion to suppress statements he made while talking on the phones at the Los Angeles Detention Center as "fruit of the poisonous tree." Cuddy contends that the only reason he made the statements at the detention center was because he knew the government had already obtained incriminating statements from him based upon earlier unlawful questioning.
 
 
 26
 Because Cuddy raised this argument in his objections to the magistrate judge's report and recommendation, he has not waived appellate review of this issue; however, the trial court correctly refused to suppress Cuddy's statements. People v. Montano, 226 Cal.App.3d 914, 277 Cal.Rptr. 327 (Cal.App.1991), relied upon by Cuddy, is not controlling authority and involved factual circumstances distinguishable from those at hand. In Montano, the court concluded that the prosecution had failed to meet its burden of demonstrating that the second confession was "sufficiently an act of free will to purge" the taint of the illegality surrounding the first confession because it was obvious that the psychologically coercive tactics used to extract the first confession were the force behind the second confession.
 
 
 27
 Unlike in Montano, it does not appear that the statements Cuddy made to his friends and family while he was at the detention center were the result of earlier, psychologically coercive tactics.
 
 Change of Venue
 
 28
 Cuddy moved for a change of venue on the ground of pre-trial publicity pursuant to Fed.R.Crim.P. 21(a), which provides that a district court shall transfer a pending criminal case to another jurisdiction if the court "is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that the defendant cannot obtain a fair and impartial trial" in that district.
 
 
 29
 A district court has broad discretion in ruling on a motion for change of venue, and we will reverse only for abuse of discretion. United States v. Flores-Elias, 650 F.2d 1149, 1150 (9th Cir.), cert. denied, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981).
 
 
 30
 A defendant need only demonstrate one of two different types of prejudice in support of a motion to transfer venue: presumed or actual. "Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir.1988), cert. denied, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990) (emphasis added). Prejudice is rarely presumed "because 'saturation' defines conditions found only in extreme situations." Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir.1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994). To establish actual prejudice, the defendant must demonstrate that the jurors exhibited "actual partiality or hostility that could not be laid aside." Harris, 885 F.2d at 1363.
 
 
 31
 The district court did not abuse its discretion in denying Cuddy's motion for change of venue because he demonstrated neither presumed nor actual prejudice. The single March 30, 1994 article, which reported statements made by Cuddy that the district court held could be used for impeachment purposes only, is not sufficient to support a finding that Las Vegas was saturated with prejudicial and inflammatory media publicity about the crime. Furthermore, that 96% of the jurors admitted that they were aware of the case and 60% mentioned that Kevin Wynn was kidnapped, does not demonstrate actual prejudice. Although a defendant is entitled to an impartial jury, he is not entitled to a jury completely ignorant of the facts. United States v. Flores-Elias, 650 F.2d 1149 (9th Cir.1981); see also United States v. Bailleaux, 685 F.2d 1105, 1108 (9th Cir.1982) ("It is not all publicity that causes prejudice to a defendant, but only that publicity that operates to deprive the defendant of a fair trial.").
 
 Sufficiency of the Evidence
 
 32
 Cuddy challenges the sufficiency of the evidence to support a guilty verdict against him. Specifically, Cuddy contends that the government failed to establish the interstate commerce element of 18 U.S.C. § 1951. Because the parties agree that the usual sufficiency of the evidence standard applies, we assume, without deciding, that this is the correct standard.[2]
 
 
 33
 18 U.S.C. § 1951 provides in relevant part:
 
 
 34
 Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts to conspire to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined no more than $10,000 or imprisoned not more than twenty years, or both.
 
 
 35
 (emphasis added).
 
 
 36
 Until recently, the government prosecuting an individual under § 1951 was required to show only a de minimis effect on interstate commerce, and the effect only had to be probable or potential, not actual. United States v. Phillips, 577 F.2d 495, 500 (9th Cir.1978), cert. denied, 439 U.S. 831, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978); see also United States v. Zemek, 634 F.2d 1159, 1173 n. 20 (9th Cir.1980), cert. denied, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). However, in United States v. Pappadopoulos, 64 F.3d 522, 527 (9th Cir.1995), we extended the Supreme Court's decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and held that
 
 
 37
 where Congress seeks to regulate a purely intrastate noncommercial activity that has traditionally been subject to exclusive regulation by state or local government, and where the connection of the regulated activity as a whole to interstate commerce is neither readily apparent nor illuminated by express congressional findings, the government must satisfy the jurisdictional requirement by pointing to a "substantial" effect on or connection to interstate commerce.
 
 
 38
 Assuming that the government in this case was required to establish that Cuddy's actions had a "substantial" effect on interstate commerce, we find that it met its burden. The government presented evidence demonstrating that the Mirage Hotel & Casino was engaged in interstate commerce and that the proceeds that were used to pay Ms. Wynn's ransom would have otherwise been used in the Mirage's business. Specifically, at trial Steven Wynn testified that Mirage Hotel & Casino Resorts, Incorporated, has offices in other states and other countries. The Mirage Hotel & Casino in Las Vegas uses wire services on a daily basis to transfer funds of the corporation and its guests and customers, to repay casino and business receivables and for other corporate transfers between the casino's banks and subsidiary bank accounts. The wire transfers are usually between Las Vegas and other states or countries. The Mirage Hotel & Casino also uses telephone communications on a daily basis outside of Nevada and the United States. The Mirage has a "large advertising budget which seeks to extend the company, its trademark and its messages to virtually every state in the Union, Canada, Latin America, Mexico, and Asia." Finally, the Mirage has ongoing relationships with "wholesalers" who bring in people from all over the country as well as Canada to fill the rooms on a weekly basis. We hold that the diversion of $1.45 million from a business engaged in interstate commerce clearly has a substantial effect on interstate commerce.
 
 BOTH DEFENDANTS
 Sentencing
 
 39
 Both defendants appeal their sentences. Sherwood contends that the district court erred in departing upward pursuant to U.S.S.G. § 3A1.1 (vulnerable victim) and U.S.S.G. § 5K2.8 (extreme conduct). Cuddy contends that the district court erred in departing upward pursuant to U.S.S.G. § 5K2.8 (extreme conduct), Application Note 8 to U.S.S.G. § 2B3.2 (threat to a family member) and U.S.S.G. § 3C1.1 (obstructing the administration of justice).
 
 
 40
 Departure is permitted when certain aspects of a case are "unusual enough for it to fall outside the heartland of cases in the Guideline," and "[d]istrict courts have an institutional advantage over appellate courts in making these sorts of determinations." Koon v. United States, --- U.S. ----, ---- - ----, 116 S.Ct. 2035, 2046-47, 135 L.Ed.2d 392 (1996). Consequently, "[a] district court's decision to depart from the Guidelines ... will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court." Id. Of course, "whether a factor is a permissible basis for departure under any circumstances is a question of law" and a district court may be reversed under an abuse of discretion standard if the decision to depart is based upon an error of law. Koon, --- U.S. at ----, 116 S.Ct. at 2047. However, we are not confronted with a question of law in this case because the district court chose to depart upward based upon circumstances that the Guidelines specifically set forth as a permissible basis for departure.
 
 U.S.S.G. § 5K2.8
 
 41
 Having reviewed the district court's findings under an abuse of discretion standard, Koon, --- U.S. at ----, 116 S.Ct. at 2035, we leave undisturbed its finding that Cuddy and Sherwood's conduct was "extreme" within the meaning of § 5K2.8. The guideline is labeled "extreme conduct" and provides:
 
 
 42
 If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.
 
 
 43
 We have previously upheld upward departures involving unusually heinous, cruel and brutal acts. The guideline, however, is written in the disjunctive. Therefore, an upward departure is also allowed for "unusually degrading" conduct distinct from cruel and heinous behavior. It is upon this basis that the district court relied in departing upward.
 
 
 44
 It is evident that the district court carefully considered the facts before finding that an upward departure was appropriate. The court first considered whether the offense level had taken into account the conduct which was alleged to be "unusually degrading." The offense level guideline, § 2B3.2, does provide for aggravation if the person was abducted but it does not permit aggravation for degrading or humiliating conduct. The district court then correctly concluded that forcing this young woman to disrobe blindfolded in front of two men who had violently abducted her and then took photographs of her was unusually degrading.
 
 
 45
 The district judge's conclusion is supported by the testimony of Kevin Wynn. She stated that after she was ordered to disrobe she "started to shake because [she] thought, [she was] going to have to take off [her] clothes and [she was] going to be raped, and that's what [she] thought the next thing was." She was also asked if she knew who Amy Fisher was and told "these pictures would be sent around the country to various press and media with a story and [the defendant] didn't elaborate ... [he] was letting me use my imagination." After she removed her clothes she tried to cover her chest and was told by one of the defendants to get down on the floor. "And then when [she] sat down on the floor [the defendant] told [her] to move [her] arms and put them behind [her] for the pictures."
 
 
 46
 On these facts the court correctly concluded that to be forced to disrobe with the threat of publication of photographs was unusually degrading. Although a man may not have felt degraded when stripped to the waist, a woman is plainly different. Also, it is not conjecture to assume that if a man had been completely stripped, photographed and threatened that the pictures would be distributed to the world, he would have felt unusually degraded.
 
 
 47
 We also leave undisturbed the district court's finding that Ms. Wynn was a victim within the meaning of § 5K2.8. The case which is controlling is United States v. Haggard, 41 F.3d 1320, 1325-28 (9th Cir.1994). The defendant's criminal conduct consisted of misleading the FBI and the grand jury by informing them that he knew the whereabouts of a missing child of the family members. The family members were not misled; the defendant did not make false statements to them or obstruct their investigation. We found, however, that the family members were direct victims of the crime of obstruction.
 
 
 48
 Concomitantly, this Court found in Haggard that the family members were victims under U.S.S.G. § 3A1.1 (vulnerable victim). The defendant again argued that only the federal government was a true victim because the statutes under which he was convicted were designed to protect the government, not private individuals such as family members. In finding that the family members were victims we relied substantially on U.S.S.G. § 1B1.3(a)(3) which specifically instructs the district court, in determining the defendant's base offense level, to take into account "all harm" the defendant causes. The Court stated, "We conclude that even though the harm Haggard caused [the missing child's] family members was not an element of any of the crimes of which he was convicted, the district court did not err in considering them vulnerable victims for purposes of Section 3A1.1." Id. at 1326.
 
 
 49
 Here the crimes of conviction, that is (1) Conspiracy in violation of 18 U.S.C. § 1951; (2) Interference with Commerce by Threats or Violence in violation of 18 U.S.C. § 1951; (3) Use of a Firearm During a Crime of Violence in violation of 18 U.S.C. § 924(c); and (4) (Cuddy) Laundering Money Instruments in violation of 18 U.S.C. § 1956, and (Sherwood) Conspiracy in the Laundering of Money Instruments in violation of 18 U.S.C. § 1956, appear only to directly protect Kevin Wynn's father and the Hotel. But, as in Haggard, it would be absurd to conclude that the person who was the focal point of the crime and severely harmed by it was not a direct victim.
 
 
 50
 The dissent errs in its reliance on United States v. Hoyungowa, 930 F.2d 744 (9th Cir.1991). In that case, the defendant was charged with second degree murder for killing a police officer. We found that the officer's family members (who did not witness the crime nor encounter the perpetrators in its commission but were merely affected by it) were not direct victims of the crime of conviction for purposes of U.S.S.G. § 5K2.3, which permits an upward departure if the victim or victims suffered "psychological injury much more serious than that normally resulting from commission of the offense ..." The present case is identical to Haggard, in which we distinguished Hoyungowa on the ground that lying to the federal government and the FBI directly victimized the family because the family was targeted and victimized by the defendant for commission of the crime. Here Kevin Wynn was also the defendants' chosen target of the crimes. The defendant deliberately abducted her to effectuate the commission of extortion.
 
 
 51
 The dissent claims that Haggard is distinguishable because of language we do not discuss in this opinion, i.e., "[Defendant] deliberately and repeatedly lied for the express purpose of affecting [the] family." United States v. Haggard, 41 F.3d at 1327. The dissent contends that "there is no evidence that defendants' purpose was to affect Kevin." This is a misunderstanding of the salient facts of this crime. The defendants here knew if they did not directly and adversely affect Kevin they would not achieve their planned extortion. Thus, after she had been kidnapped, stripped and photographed, a terrified Kevin was forced to make a call for the purpose of terrifying her father. Thus the victimization of Kevin was inextricably intertwined with the victimization of her father and the Hotel.
 
 
 52
 Application Note 8 of § 2B3.2 and/or U.S.S.G. § 3A1.1
 
 
 53
 First, it is unclear from the record whether the district court departed upward at Sherwood's sentencing pursuant to U.S.S.G. § 3A1.1, which permits an upward departure where the defendant knew or should have known that the victim was unusually vulnerable, or pursuant to Application Note 8 of § 2B3.2, which authorizes an upward departure where the offense involved a threat to a family member of the victim. The district court began by stating that it was not inclined to depart upward based upon § 3A1.1 because it was not sure that Mr. Wynn was a vulnerable victim within the meaning of the guidelines. The government responded by suggesting that the district court should depart upward based upon Application Note 8 and simply analogize to § 3A1.1 for purposes of determining the extent of the departure. The court then departed upward two additional points, stating:
 
 
 54
 Counsel, you've convinced me that, you know, clearly there is a threat and was a threat to a family member and not just a family member. I remember the testimony of Mr. Wynn as he spoke, and the relationship is a very special relationship to take advantage of that. There was a watching, and to some degree I have the feeling perhaps an understanding of this special relationship. The Wynns have been responsible in this community for some noteworthy creations, but I have a feeling that both of the parents would agree that none of them are comparable to the creation of this unusual young woman. And I have a feeling that they take far more pride in her than in any of the impressive hotels that they have created.
 
 
 55
 And accordingly, the Court will impose the 2 points and I think pursuant to the guidelines, as well with respect to this photo session.
 
 
 56
 Although one could surmise from the reference to a threat that the district court departed upward pursuant to Application Note 8 and although at Cuddy's sentencing the district court suggested that it had actually departed upward at Sherwood's sentencing based upon Application Note 8 rather than § 3A1.1, we note that later on during Sherwood's sentencing the following exchange occurred between Sherwood's attorney and the district court:
 
 
 57
 MR. ALBRECHTS: Your Honor, prior to that, did the Court give upward departure points--2 points for both extreme conduct and vulnerable victim?
 
 
 58
 THE COURT: Yes.
 
 
 59
 Assuming the district court departed upward pursuant to § 3A1.1, we agree with Sherwood that the district court's finding that the Wynns were unusually close is insufficient to warrant application of § 3A1.1.
 
 
 60
 We note that in determining whether a remand is required where the sentence was imposed as a possible result of an incorrect application of the sentencing guidelines, the court of appeals must determine whether a district court would have imposed the same sentence had it not relied upon the invalid factor or factors. Williams v. United States, 503 U.S. 193, 201, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992). In other words the court of appeals must be able to determine from the record whether the sentence was imposed "as a result of" the district court's incorrect application of the guidelines or whether the error did not affect the district court's selection of the sentence imposed. Id. 503 U.S. at 203-07, 112 S.Ct. at 1121-22. Unless the court of appeals concludes that the error did not affect the district court's selection of the sentence, it must remand to the district court for resentencing.
 
 
 61
 Importantly, when some but not all of the district court's reasons for departure are invalid, the court of appeals must determine whether the district court would have imposed the same sentence based upon the valid factors, not whether it could have based its departure on the remaining factors. The majority in Williams rejected the dissent's position that the appellate court is to consider whether the district court could have based its departure on the remaining factors because "it is the prerogative of the district court, not the court of appeals, to determine, in the first instance, the sentence that should be imposed." Id. 503 U.S. at 201, 203-07, 112 S.Ct. at 1120, 1121-22. Based upon a review of the record it is possible to conclude that the district court would have imposed the same sentence had it not relied upon § 3A1.1, because we find it would have departed upward two points pursuant to Application Note 8, as it clearly did in sentencing Cuddy. The critical issue, however, is whether the district court would have departed upward two levels pursuant to Application Note 8 based upon valid factors under the guidelines. This question can only be answered by a review of the district court's explanation for departing upward at Cuddy's sentencing based upon Application Note 8.
 
 
 62
 A review of the transcripts of both sentencings reveals that counsel discussed three different threats--a threat that the photographs of Ms. Wynn would be published, a threat to kidnap Ms. Wynn, and a threat to Ms. Wynn's life. It is unclear from a review of the record upon which of those "threats" the district court based its decision to depart. In their briefs, the parties do not address the propriety of an upward departure based upon the threat of publishing the photographs, and we decline to address this issue at this time. If the threat upon which the district court based its decision was a threat to kidnap Ms. Wynn, which was the position taken by the government at sentencing, the district court's finding would not be upheld. First, the evidence does not support a finding that there was an express threat to kidnap Ms. Wynn. By the time Mr. Wynn was contacted, Ms. Wynn had already been kidnapped. Second, the sentencing court relied on Guideline § 2B3.2(b)(5)(A), which established the offense level for the crime of kidnapping and takes into account the underlying threat of kidnapping which is inherent in all kidnappings. Finally, if the threat was a threat to Ms. Wynn's life, the present record does not support a finding that Ms. Wynn's life was ever threatened.
 
 
 63
 Thus, in Sherwood's case, if the district court departed upward pursuant to § 3A1.1, we find that it erred in doing so. Although perhaps the district court would have otherwise departed upward pursuant to Application Note 8, we are unable to find that the district court would have properly departed upward two levels based upon Application Note 8 in light of the district court's failure to explain the grounds upon which it found a "threat" to Kevin Wynn. Therefore, in accordance with the principle established by the Supreme Court in Williams v. United States, we must vacate Sherwood's sentence and remand for resentencing.
 
 
 64
 In Cuddy's case, we find that, if the district court departed upward based upon a threat of kidnapping, it erred in doing so. Because we are unable to determine that the district court would have departed upward pursuant to Application Note 8 based upon any of the other threats mentioned at sentencing, we must also vacate Cuddy's sentence and remand for resentencing.
 
 U.S.S.G. § 3C1.1
 
 65
 Finally, Cuddy contends that the district court erred in giving him a two-point enhancement for obstruction of justice because it erred in finding that he testified falsely at his suppression hearing. Obstruction enhancement is mandatory once a proper supporting factual finding is made. United States v. Ancheta, 38 F.3d 1114, 1117-18 (9th Cir.1994). We review factual findings made by the district court in the sentencing phase for clear error. United States v. Thompson, 80 F.3d 368, 370 (9th Cir.1996).
 
 
 66
 The district court found that Cuddy made false statements at his suppression hearing when he suggested that he was unaware his phone calls were being monitored at the detention center because he did not have his glasses. The district court relied on statements Cuddy made during his phone conversations such as "these calls are being monitored" and "they monitor all our calls so if I--if you ask me a question, I can't answer it. You'll have to understand." The court found that Cuddy "made a tortured argument" when he testified at the hearing that "they" referred to his attorneys. The district court also noted that during another conversation Cuddy was asked whether the conversation was being taped, to which Cuddy replied "I don't--I--there's a sign on the wall here that says it is, but I don't know."
 
 
 67
 Cuddy contends that he truthfully answered the questions posed to him at the suppression hearing. A review of his testimony, however, reveals that Cuddy was evasive in his answers, as if he was specifically attempting to suggest that he was not aware the detention center was taping his calls without specifically saying he was not aware they were taping his calls. Overall, Cuddy's testimony conveyed the impression that he did not know that the detention center was taping his calls--an impression that is false in light of the remarks he made during his calls. Therefore, the district court did not err in finding that Cuddy made false statements at his suppression hearing.
 
 CONCLUSION
 
 68
 For the foregoing reasons, we AFFIRM the defendants' convictions, VACATE the defendants' sentences and REMAND to the district court for resentencing.
 
 
 69
 MICHAEL DALY HAWKINS, Circuit Judge, concurring:
 
 
 70
 I am pleased to concur in the thoughtful and carefully written majority opinion.
 
 
 71
 The dissent contests the notion that Kevin Wynn was a "victim" of the defendants' conduct. Ms. Wynn, seventeen years old at the time, was forcibly removed from her home at gunpoint and held captive by the defendants while they extorted money from her father. While she was held, the defendants subjected her to conduct that all three members of this panel agree was extreme and unusually degrading.
 
 
 72
 The contention that Ms. Wynn was not a victim seems to center around the nature of the charges, that kidnapping was not charged. That the actual charges employed involved conspiracy to "interfere with interstate commerce by threats or violence" does not change the nature of the basic criminal activity involved and certainly does not diminish Kevin Wynn's status as a victim. The Sentencing Guidelines, especially after Koon v. United States, --- U.S. ----, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), do not cabin discretion so tightly. To the contrary, the Guidelines teach that sentences should be fashioned to reflect the actual nature of the offense involved.[1]
 
 
 73
 Although the purpose of the threats here were to extort money from her father's business, those threats were also clearly aimed at Kevin Wynn. She was the one who stood to be harmed if the defendants' demands were refused. Kevin Wynn was thus directly in the defendants' line of fire; she was not "incidental" to their plan and announced intentions. The district court committed no error in so finding.
 
 KOZINSKI, Circuit Judge, dissenting in part:
 
 74
 The majority errs in holding that Kevin Wynn was a "victim" of defendants' conduct under U.S.S.G. § 5K2.8. It's true that Wynn was victimized by the kidnapping, but defendants were not convicted of kidnapping. Instead, they were convicted of conspiracy to interfere with, and interference with, interstate commerce through threats or violence. See 18 U.S.C. § 1951. The victim of these crimes was either Steven Wynn or the Mirage Hotel. Both defendants were also convicted of using a firearm in a crime of violence. See 18 U.S.C. § 924(c). In addition, Cuddy was convicted of laundering money and Sherwood was convicted of conspiring to launder money. See 18 U.S.C. § 1956. However, the firearm convictions resulted in five-year mandatory consecutive sentences; no judicial discretion was involved. And it cannot be seriously argued that Wynn was a victim of money laundering.
 
 
 75
 In United States v. Hoyungowa, 930 F.2d 744 (9th Cir.1991), we vacated a sentence because the district judge interpreted "victim" in an overbroad manner in imposing an upward departure for extreme psychological injury under U.S.S.G. § 5K2.3. We held that "this Guideline applies by its plain terms only to the direct victim of the crime and not to others affected by the crime ..." Id. at 747 (emphasis added). Because U.S.S.G. § 5K2.3 is closely related to U.S.S.G. § 5K2.8, I don't see how we can interpret "victim" in section 5K2.8 to encompass Kevin Wynn, who was not "a direct victim of the crime" of interfering with interstate commerce, but merely one "affected by the crime." See United States v. Haggard, 41 F.3d 1320, 1327 (9th Cir.1994) (assuming that Hoyungowa applies to U.S.S.G. § 5K2.8).
 
 
 76
 The majority argues that this case is controlled by Haggard; in support, it points to a passage where we say that a family was the victim of the defendant's crimes because "[the defendant] specifically singled out [the family] as the object of his criminal scheme." Id. According to the majority, Kevin Wynn was similarly singled out by these defendants. Maj. op. at 413. My colleagues, however, omit the next sentence in the passage quoted: "[Defendant] deliberately and repeatedly lied for the express purpose of affecting [the] family." Id. Here, there is no evidence that defendants' purpose was to affect Kevin Wynn. Any effect on her was incidental to the real object of their criminal scheme: To extort money from Steven Wynn and the Mirage Hotel.
 
 
 
 *
 Honorable Roslyn O. Silver, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 In Bailey v. United States, --- U.S. ----, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court of the United States ruled that 18 U.S.C. § 924(c)(1) required that the "use" of a firearm must be the active employment of it during and in relation to the predicate crime. In the instant case the defendants did actively use the firearm by pointing it at the victim during commission of the crime
 
 
 [2]
 In United States v. Barone, 39 F.3d 981 (9th Cir.1994), we noted that although jurisdiction is a legal question ordinarily reviewed de novo, because the question of whether a defendant's actions resulted in sufficient effects on interstate commerce, is a jurisdictional question intertwined with the merits which must be resolved by the jury, the standard for reviewing the sufficiency of evidence to support a jury verdict may be the correct standard to apply
 
 
 [1]
 See, e.g., United States Sentencing Commission Guidelines Manual, Chapter One, Part A, Subpart 4(b)