Filed 4/6/21  P. v. Aguil CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>FRANCISCO RUFINO AGUIL,<br><br>    Defendant and Appellant. | F078612<br><br>(Super. Ct. No. BF168785A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Caely E. Fallini, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted Francisco Rufino[1] Aguil (defendant) of committing sex crimes against an underage victim. This appeal concerns the admissibility of a recorded confession. Defendant alleges a violation of his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and further contends his statements were coerced. We conclude the confession was voluntarily given in response to noncustodial interrogation.

Defendant makes alternative claims of sentencing error based on the imposition of certain fines, fees, and assessments. The People make a partial concession, submitting the matter should be remanded for the trial court to identify the statutory basis for a total of $1,860 in assessments. We accept the concession and agree with the proposed remedy. The judgment is otherwise affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and the victim are blood relatives. In May 2017, the victim (then age 14) told her mother that defendant began molesting her when she was 12 years old and he was between the ages of 18 and 19. The abuse continued past her 13th birthday, progressing to acts of oral sex and intercourse. The allegations were reported to the police on May 24, 2017.

On June 7, 2017, the police recorded a pretextual phone call made by the victim to defendant for the purpose of eliciting incriminating statements. The conversation was brief, and defendant denied having any memory of the events about which he was asked. On June 21, 2017, the police recorded another "pretext call" initiated by the victim's mother. The mother's approach was very aggressive and accusatory. Defendant told her the victim had "come on to [him]," i.e., tried to initiate physical intimacy, but he claimed to have rejected her advances. After approximately 45 minutes of repeating such denials, defendant finally admitted the allegations were true.

---

[1]In the charging documents and abstract of judgment, defendant's middle name is spelled "Rugino." But from his birth certificate, located in the record, his middle name is actually "Rufino." We will use that spelling and direct the trial court to correct the abstract.

On June 22, 2017, two police detectives made an unscheduled visit to the home of defendant's grandmother, where defendant was residing. The grandmother invited the detectives inside, and defendant agreed to speak with them. They activated an audio recording device prior to entering the home. After approximately 10 minutes of questioning, defendant incriminated himself. He was placed under arrest a few minutes later.

Defendant was charged with committing a lewd act upon a child under the age of 14 (Pen. Code, § 288, subd. (a)) and continuous sexual abuse of a child under the age of 14 (*id*., § 288.5, subd. (a); all undesignated statutory references are to the Penal Code). The case went to trial in September 2018, at which time defendant unsuccessfully moved to suppress evidence of his conversation with the detectives. The claims on appeal do not require a summary of the trial evidence.

Defendant was found guilty as charged. In December 2018, the trial court imposed a 14-year prison sentence. The notice of appeal was filed on the date of sentencing.

## DISCUSSION

## I. Admissibility of Defendant's Interview Statements

### A. Additional Background

The hearing on defendant's motion to suppress included testimony by defendant's grandmother and Detective Rick Wimbish of the Bakersfield Police Department. The trial court also listened to an audio recording of the interview. The following summary is derived from the witness testimony and our independent review of the recording.

On June 22, 2017, the day after the second pretext call, Detective Wimbish and his partner went to defendant's residence. They pulled up to the house in an unmarked car, arriving shortly before 11:00 a.m. The detectives were not in uniform but wore professional attire, i.e., "dress slacks, dress shirt, and a tie." Detective Wimbish wore a lanyard displaying his police identification and had a holstered firearm at his hip.

The detectives knocked on the front door and proceeded to converse with the primary occupant, defendant's grandmother. Detective Wimbish described the initial encounter: "[S]he said that [defendant] was sleeping, and she was going to go wake him up so he could speak with us. And then she came back to the door, and we spoke a little bit longer about—small talk until [defendant] arrived at the door."

Detective Wimbish's partner activated the recording device during the so-called "small talk." It is evident from the recording that defendant's grandmother knew why the detectives were there and was aware of the victim's allegations. She stated, in reference to the victim's mother, "I thought he [defendant] should have told her, '… I am not coming to your house no more 'cause, uh, [the victim] is [following] me around and touching me and won't leave me alone.' And so maybe that way she [the victim's mother] would have believed him. But … he was in special class in school for—he's not that bright. Sometimes I tell him, 'Give me the white clothes to go wash 'em.' He give me [the] color one. I said that's [color]—that's not white."[2]

Detective Wimbish interrupted the grandmother to ask again if defendant was home. We quote the salient parts of the recording (brackets indicate discrepancies between what can be heard on the recording and what appears in a written transcript of the same):[3]

"DET. WIMBISH: Is Francisco … here?

---

[2]In arguing the motion to suppress, the defense emphasized the fact defendant had been in special education classes in high school. However, the testimony of school personnel with knowledge of his education records established defendant had an IQ score of 93, which is within the range of "average" intelligence. Despite a learning disability in the areas of reading and writing, he graduated from Delano High School at the age of 18.

[3]The trial court noted there were unspecified "disagreements about the transcript." For our purposes, the only material difference is the fact the grandmother can clearly be heard suggesting the detectives speak to defendant in a "bedroom." Her statement is inaccurately and incompletely transcribed as "You say you got a room." Next, someone says, "That's fine." The transcript attributes the statement to Detective Wimbish's partner, but it sounds like defendant's voice.

4.

"[GRANDMOTHER]: Uh, that's him [right] there. Want to go outside or do you want to come inside?

"DET. WIMBISH: It doesn't matter … [—]

"[GRANDMOTHER]: Oh, come on in then.

"DET. WIMBISH: [—] He can come out or whatever [—]

"[GRANDMOTHER]: [Want in or out?]

"DET. WIMBISH: [—] Whatever's more convenient for you. Is there a place we can talk privately in here?

"[DEFENDANT]: [[Unintelligible]]

"[GRANDMOTHER]: You [can go in] a room, [bedroom].

"[UNKNOWN]: That's fine.

"DET. WIMBISH: [Okay, yeah, if that works for you.] [W]e appreciate it."

The detectives followed defendant to his room. Defendant said, "sorry," apparently in reference to the state of the bedroom. The conversation continued:

"DET. WIMBISH: … That's fine. Hopefully, we won't take too awfully long. Uh, there's my card. I'm Detective Wimbish. I'm with the Bakersfield Police Department. This is Detective Tipton and I might just sit right here if that's okay with you?

"[DEFENDANT]: Sure.

"DET. WIMBISH: Okay. And you're Francisco?

"[DEFENDANT]: Yes.

"DET. WIMBISH: Is it okay if we sit here and talk for a little bit about some stuff?

"[DEFENDANT]: Yeah.

"DET. WIMBISH: Okay. Appreciate you're inviting us—inviting us in …."

Detective Wimbish asked for defendant's full name, date of birth, and other identifying information, which defendant provided. Defendant also produced his Social

Security card.  After reviewing the card, Detective Wimbish began what the parties agree was an interrogation.  The interrogation starts at approximately six minutes and 10 seconds into the recording:

> "DET. WIMBISH:  … I'm sure you know why we're here.
>
> "[DEFENDANT]:  Kind of ….
>
> "DET. WIMBISH:  What do you know about why we're here today?
>
> "[DEFENDANT]:  [The victim's mother and the victim] and everything.  Yeah.
>
> "DET. WIMBISH:  Okay.  Can you tell me some more about that?"

Defendant spent approximately seven minutes providing narrative statements about his family background and interactions with the victim during the relevant time period.  His statements were apparently intended to be exculpatory.  The victim was portrayed as having behaved in vaguely inappropriate ways toward him, culminating in her attempt to "blackmail" defendant by threatening to falsely accuse him of molestation unless he complied with her various demands.

Detective Wimbish listened passively, sometimes asking for clarification about locations and the identities of family members.  He also asked whether the victim had ever "flirted" with defendant.  Defendant answered, "Kind of yeah.  Like there's times but like I would just ignore it and like 'cause I didn't—I'm not tryin' to get in that kind of situation 'specially like with my family …."

Defendant's involuntariness claim is based on what occurred after he provided the exculpatory narratives, beginning at approximately 13 minutes and 25 seconds into the recording:

> "DET. WIMBISH:  Okay.  Well you obviously know because we're here that they've made a police report.
>
> "[DEFENDANT]:  Yeah.

"DET. WIMBISH: Uh, so I've sat and talked with [the victim] and—and she's basically told [me] what happened and, uh, she's basically told me that—that you forced [this] sex on her. So, my—my—my—one of my questions is you know was it you actually forcing her to do this or was it mutual? Was it consensual on both of your parts?

"[DEFENDANT]: I wanna say we've never had sex, but I never forced her to do nothing.

"DET. WIMBISH: Mm-hm.

"[DEFENDANT]: At all.

"DET. WIMBISH: So, the sex you [guys] had that was consensual then?

"[DEFENDANT]: We never had sex.

"DET. WIMBISH: Okay well I didn't just get this report this morning or I didn't [even] just get it yesterday. I got it about three to four weeks ago. So, I've been workin' on this for quite a while. Okay? And I've also talked to your Uncle Robert. Okay? And he told me about the conversation that you guys had. Okay? And that's all already documented in the report weeks ago the conversation you had talkin' to him about having sex with [the victim]. Okay? So, again, one of my questions is because I'm trying to determine if this was consensual sex you had with [the victim] or if it was—or if you held her down and made her do it. I [mean you're saying] she started flirting with you so I'm tryin' to determine if it was consensual sex you had with [the victim] or if you forced her to do it.

"[DEFENDANT]: It was consensual.

"DET. WIMBISH: It was consensual[?] And I understand that the sex you had with [the victim] was on multiple occasions[.] And she … apparently has [some] clothes left from one of those times that there might be some DNA on. Uh, [we're] gonna find your DNA on her clothes you think?

"[DEFENDANT]: I don't know.

"DET. WIMBISH: Okay. So, she also says that you used a condom every time you guys had sex except for maybe once she wasn't sure. Do you think you used a condom every time you had sex with her? No? Did you use condoms sometimes with her? Yeah. Uh, and then she said during

7.

the oral sex you—you never used a condom.  Is that correct?  You're shaking your head yes?

"[DEFENDANT]:  Yes sir.

"DET. WIMBISH:  Okay.  How many times do you think you had oral sex with her?

"[DEFENDANT]:  Every time I was asleep on the couch and she would come and bother me.

"DET. WIMBISH:  Okay.  [Talking like] five ten fifteen twenty times you think or less than twenty?

"[DEFENDANT]:  Less than 10.

"DET. WIMBISH:  Less than 10.  And then how 'bout regular sexual intercourse.  How many times you think that occurred?

"[DEFENDANT]:  [As many times as] she bothered me in the middle of the night.

"DET. WIMBISH:  Less than 20?

"[DEFENDANT]:  Less than 10."

The interrogation continued for another four minutes before defendant was placed under arrest.

The trial court found, in pertinent part:  "[I]t [was] an interrogation; however, I don't think there [are] any facts that support he was in custody.  … It appeared to be clearly consensual first by the grandmother and then by defendant."  Defendant's statements were also found to have been voluntarily given.  Accordingly, the motion to suppress was denied.

**B.** *Miranda* **Claim**

If a defendant is subjected to custodial interrogation without being advised pursuant to *Miranda*, statements made during the interrogation cannot be used in the prosecution's case-in-chief.  (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162; *People v. Thornton* (2007) 41 Cal.4th 391, 432.)  "Under *Miranda*, police officers must warn a suspect before questioning that he or she has the right to remain silent and the right to the

8.

presence of an attorney." (*People v. Case* (2018) 5 Cal.5th 1, 20.) "In reviewing *Miranda* issues on appeal, we accept the trial court's resolution of disputed facts and inferences as well as its evaluations of credibility if substantially supported, but independently determine from undisputed facts and facts found by the trial court whether the challenged statement was legally obtained." (*People v. Smith* (2007) 40 Cal.4th 483, 502.) "Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.)

In "*Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." (*Howes v. Fields* (2012) 565 U.S. 499, 508–509.) "Interrogation consists of express questioning or of words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1224.) The fact defendant was interrogated is not in dispute. However, in the absence of *custodial* interrogation "*Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)

"The key question is whether, under all of the objective circumstances, a reasonable person in the suspect's position would have felt free to terminate the interrogation. [Citations.] But even if a person's freedom of movement has been curtailed, an 'additional question' arises: 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.' [Citations]." (*People v. Caro* (2019) 7 Cal.5th 463, 491.) The *Miranda* case involved "incommunicado interrogation of individuals in a police-dominated atmosphere" where the suspects were "cut off from the outside world." (*Miranda*, *supra*, 384 U.S. at p. 445.)

"Relevant factors include the location of the questioning [citation], its duration [citation], statements made during the interview [citations], the presence or absence of

physical restraints during the questioning [citation], and the release of the interviewee at the end of the questioning [citation]." (*Howes v. Fields*, *supra*, 565 U.S. at p. 509.) "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory.'" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404.)

There are factors weighing in favor of both defendant and the People. On the one hand, for example, Detective Wimbish made clear defendant was the subject of a criminal investigation and confronted him with evidence of his guilt. On the other hand, the questioning was brief and nonaggressive. Defendant was interrogated for less than 15 minutes, beginning when he was asked "What do you know about why we're here today?" and ending when he was told to follow the detectives to their car.

The location factor cuts both ways. In contrast to the "inherently coercive atmosphere" of a police station (*People v. Montano* (1991) 226 Cal.App.3d 914, 939; see *Berkemer v. McCarty* (1984) 468 U.S. 420, 438), a suspect "is more likely to be '"confident, indignant, or recalcitrant"' [citation] and '"more keenly aware of his rights and more reluctant to tell of his indiscretions or criminal behavior within the walls of his home."'" (*People v. Saldana* (2018) 19 Cal.App.5th 432, 456, quoting *Miranda*, *supra*, 384 U.S. at pp. 449–450.) If family members are nearby, "their presence [can provide] moral support." (*Miranda*, at p. 450.) However, questioning defendant in his bedroom arguably restricted his freedom of movement. Defendant emphasizes this point, but it was his grandmother who suggested they go into the bedroom. The detectives had said, "[H]e can come out[side] or … whatever's more convenient for you."

In *People v. Linton* (2013) 56 Cal.4th 1146, the questioning of a murder suspect inside of his home was determined to be noncustodial interrogation. (*Id*. at pp. 1167–

10.

1168.) After a detective and a deputy district attorney had asked to speak with him, the appellant "invited them into his house, taking them into his bedroom." (*Id*. at p. 1167.) The appellant was not restrained, and there was "no evidence that they blocked [his] exit from the bedroom." (*Ibid*.) The appellant was questioned "for about a half-hour," and "[t]he nature of their questioning" was neither "aggressive [nor] particularly confrontational." (*Ibid*.)

Few circumstances distinguish the interrogation in this case from the one in *Linton*. Defendant's interview was shorter, which does not help his argument. The *Linton* interrogators carried no visible firearms, which is a detail weighing in defendant's favor. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1167.) Most significantly, the *Linton* appellant was repeatedly told he was not under arrest and did not have to answer any questions. (*Ibid*.) Such assurances were not provided to defendant, but the general message was at least partially conveyed (albeit subtly) when Detective Wimbish asked, "Is it okay if we sit here and talk for a little bit about some stuff?" Defendant responded affirmatively, and the detective said he appreciated the fact defendant had invited them inside.

The audio recording tips the scale in favor of the People. It shows Detective Wimbish was calm and polite, and that he deferred to defendant and his grandmother with respect to where the interview took place. As observed by the trial court, the interactions come across as entirely consensual. After spending the first half of the interview listening to defendant's narrative statements, the detective matter-of-factly disclosed what he had learned from the victim and her family. Defendant began to confess just a few moments later.

"'[A]ccusatory questioning is more likely to communicate to a reasonable person in the position of the suspect[] that he is not free to leave' than would general and neutral investigative questions. Thus, on the issue of custody, courts consider highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive,

11.

confrontational, threatening, intimidating, and accusatory. [Citations]." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1164.) While not entirely free of accusations, Detective Wimbish's conversation with defendant was brief, polite, courteous, and nonthreatening. Based on the totality of the circumstances, we conclude defendant's confession was made in a noncustodial setting. As such, there was no *Miranda* violation.

### C.    Voluntariness Claim

Defendant further contends his statements were coerced. He makes three related arguments. Detective Wimbish is said to have exploited the circumstance of defendant being "a person of lower intelligence." Because of his intellectual "deficiencies," defendant's free will was allegedly overborne by "deceptive interrogation tactics." He also claims there was an implied promise of leniency.

The People argue forfeiture. However, defendant raised the issue of voluntariness in a motion in limine and made several arguments regarding his intellect. The trial court ruled the evidence did not "give[] rise to a claim of involuntariness." Assuming the claim was not forfeited, it fails on the merits.

"'Both the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.'" (*People v. Wall* (2017) 3 Cal.5th 1048, 1065.) It is the People's burden to establish voluntariness by a preponderance of the evidence. (*Id.* at p. 1066.) The issue presents "a mixed question of law and fact that is nevertheless predominantly legal" and subject to de novo review. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 649; accord, *People v. Linton*, *supra*, 56 Cal.4th at p. 1177.) "Our voluntariness determination rests on an 'independent' consideration of the entire record, including ""the characteristics of the accused and the details of the [encounter].""" (*People v. Mendez* (2019) 7 Cal.5th 680, 698.)

"A confession of a crime is not inadmissible merely because the accused was of subnormal intelligence, although subnormal intelligence is a factor that may be considered with others in determining voluntariness." (*In re Norman H.* (1976) 64

Cal.App.3d 997, 1001; accord, *People v. McWhorter* (2009) 47 Cal.4th 318, 358.) Defendant was questioned two weeks prior to his 21st birthday. As discussed in footnote 2, *ante*, defendant had an IQ score of 93, meaning he was/is a person of average intelligence. That is certainly how he comes across on the audio recording of the interrogation. The trial court was not persuaded by the lack of intelligence argument, and neither are we.

Next, defendant alleges Detective Wimbish "admitted that he told a series of lies, including that 'Uncle Robert' told him that [defendant] had talked about having sex with [the victim], and that he had potential DNA evidence." The assertion is only partially correct. The detective did concede his remark about possible DNA evidence was a ruse. However, we agree with the People that he did not lie about his conversation with defendant's uncle.

Detective Wimbish told defendant, "[I] talked to your Uncle Robert. Okay? And he told me about the conversation that you guys had." Both statements were true. The detective then specified, "the conversation you had talkin' to him about having sex with [the victim]." This statement is not disproven by the record. At the motion hearing, Detective Wimbish testified the uncle had told him defendant did not use the word "sex" and did not say the victim's name, but the uncle "stated that he believed they both knew what they were talking about." The uncle claimed defendant had said "it" happened "a couple of times and that the last time it happened was last year." Accordingly, during the interrogation, Detective Wimbish told defendant, "according to your Uncle Robert the last time that you told him was about a year ago." Since defendant was necessarily aware of what he had told his uncle, he would have known if the detective was embellishing.

"'Lies told by the police to a suspect under questioning can affect the voluntariness of an ensuing confession, but they are not per se sufficient to make it involuntary.'" (*People v. Farnam* (2002) 28 Cal.4th 107, 182.) "Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the

13.

deception is ""of a type reasonably likely to procure an untrue statement."" [Citations.] "'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.""" (*People v. Williams* (2010) 49 Cal.4th 405, 443.) For the reasons discussed, the statements about defendant's uncle do not support the claim of involuntariness.

Defendant's reliance on the DNA ruse, which actually originated in the pretext call between him and the victim's mother,[4] is unavailing for two reasons. First, the deceptive nature of Detective Wimbish's statement was not established until he was cross-examined at trial. "Our review, of course, is limited to the evidence before the court when it heard the motion."[5] (*People v. Hartsch* (2010) 49 Cal.4th 472, 491.) Second, Detective Wimbish did not mention potential DNA evidence until after defendant had already admitted to having "consensual" sex with the victim. Therefore, even if the DNA ruse could be considered in this appeal, it would not change the result. (See *People v. Maury* (2003) 30 Cal.4th 342, 405 ["The statement and the inducement must be causally linked"]; *People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 ["Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion"].)

---

[4]The victim's mother had told defendant, "You know, she still has the clothes that she wore when you guys had sex[.] [W]hat if I were to call the cops. Just to get them [tested] … for a DNA or something.… [¶] …[¶] You need to tell me the truth because I will [expletive] grab those clothes and [expletive] take it to the cops."

[5]Defendant's briefing seems to imply his trial counsel "renewed" the motion to suppress after the People rested their case. That did not happen. At most, defense counsel incorporated the arguments made in support of the motion into a trial objection interposed during direct examination of Detective Wimbish. But the defense never alleged any implied promises had been made and did not discuss the DNA remarks when arguing the suppression motion. In any event, the trial objection preceded the cross-examination testimony upon which defendant now relies.

Finally, we consider the supposed promise of leniency. A confession motivated by a promise of leniency or some other benefit is inadmissible. (*People v. Carr* (1972) 8 Cal.3d 287, 296.) "'This rule raises two separate questions: was a promise of leniency either expressly made or implied, and if so, did that promise motivate the subject to speak?'" (*People v. Tully* (2012) 54 Cal.4th 952, 986.)

Defendant's claim is based on Detective Wimbish's focus on the issue of consent. In California, "a child under age 14 is legally incapable of consenting to sexual relations." (*People v. Soto* (2011) 51 Cal.4th 229, 233.) Defendant argues the questions about whether his encounters with the victim were "consensual" implied he would not be prosecuted if he responded affirmatively. We disagree.

Although consent is not a defense to committing lewd acts upon a child, such crimes are punished more severely if they involve the use of force. A lewd act is ordinarily punishable "by imprisonment in the state prison for three, six, or eight years." (§ 288, subd. (a).) If the same act is committed by force, it is punishable "by imprisonment in the state prison for 5, 8, or 10 years." (*Id.*, subd. (b)(1).)

Detective Wimbish was not lying when he told defendant the victim had accused him of forcing her to participate in sexual activity. This was a permissible interrogation tactic. "'Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, [and] even debate between police and suspect.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) The police may suggest "possible explanations of the events and offer[] defendant an opportunity to provide the details of the crime." (*People v. Carrington* (2009) 47 Cal.4th 145, 171.)

We conclude there were no implied promises of leniency. While the claim fails for this reason alone, defendant's causation argument is also unconvincing. The first two times Detective Wimbish asked if the sex was consensual, defendant said they "never had

sex." He confessed after learning Detective Wimbush had spoken to his uncle, which, as explained above, was a permissible interrogation technique.

## II.   Sentencing Issues

### A.   Additional Background

Defendant was sentenced to the middle term of 12 years for violating section 288.5 and received a consecutive two-year term (one-third of the middle term) for violating section 288, subdivision (a). The trial court also imposed various financial obligations. At issue here is the imposition, for each conviction, of a $30 criminal conviction/court facilities assessment (Gov. Code, § 70373, subd. (a)(1)); a $40 court operations assessment (§ 1465.8, subd. (a)(1)); a $300 sex offender fine (§ 290.3); and a "penalty assessment" of $930 for reasons not specified on the record. The trial court imposed but stayed a $300 probation revocation restitution fine (§ 1202.45). Defendant was also ordered to pay a $300 restitution fine (§ 1202.4, subd. (b)(1).)

Defendant made no objections to the fines and assessments.

### B.   Failure to Identify Statutory Basis for Assessments

Case law holds "that penalty assessments must be (1) specified in the court's oral pronouncement of judgment, and (2) specifically listed in the abstract of judgment." (*People v. Hamed* (2013) 221 Cal.App.4th 928, 937, citing *People v. High* (2004) 119 Cal.App.4th 1192, 1200–1201.) "If the abstract does not specify the amount of each fine, the Department of Corrections cannot fulfill its statutory duty to collect and forward deductions from prisoner wages to the appropriate agency. [Citation.] At a minimum, the inclusion of all fines and fees in the abstract may assist state and local agencies in their collection efforts." (*High*, at p. 1200.)

Defendant claims, and the People concede, the trial court erred by failing to specify the statutory basis for the $930 in penalty assessments imposed for each conviction. Consequently, the required information is missing from the abstract of judgment. This is a "'legal error[] at sentencing' that can be reviewed on appeal

16.

"'regardless of whether an objection or argument was raised ….""" (*People v. Hartley* (2016) 248 Cal.App.4th 620, 637.)

The trial court could have satisfied the requirement by making "a shorthand reference in its oral pronouncement to 'penalty assessments as set forth in the' probation report." (*People v. Hamed*, *supra*, 221 Cal.App.4th at p. 940.) No such references were made. Moreover, the trial court appears to have stricken (by interlineation) parts of the report wherein those calculations appear.[6] We accept the People's concession and will order a limited remand for the trial court to correct the error. (Accord, *People v. Fromuth* (2016) 2 Cal.App.5th 91, 115.)

### C.    *Dueñas* Claim

Defendant separately alleges error based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which holds "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under … section 1465.8 and Government Code section 70373." (*Id*. at p. 1164.) *Dueñas* further holds that "although … section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid*.)

This appeal was already pending when the *Dueñas* opinion was published. The People do not concede the claim. However, because the matter will be remanded for the limited purpose of addressing an issue involving assessments, they do not oppose giving defendant "the opportunity to *request* an ability to pay hearing on his fines and fees" on

---

[6]The probation department arrived at $930 combining individual assessments of $300 (§ 1464, subd. (a)(1)), $60 (§ 1465.7, subd. (a)), $150 (Gov. Code, § 70373, subd. (a)(1)), $210 (*id.*, § 76000, subd. (a)), $60 (*id.*, § 76000.5, subd. (a)(1)), $30 (*id.*, § 76104.6, subd. (a)(1)), and $120 (*id.*, § 76104.7, subd. (a)).

remand. (Italics added). We agree the sentencing court may entertain such a request if made upon remand.

The California Supreme Court will soon decide whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.) However, this district has held that a defendant forfeits an "ability to pay challenge" by failing to object at the time of sentencing. (E.g., *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073–1075; contra, *People v. Son* (2020) 49 Cal.App.5th 565, 596–598.) There is a split of authority "regarding if, and under what circumstances, the forfeiture doctrine applies" (*People v. Montes* (2021) 59 Cal.App.5th 1107, 1115), and in cases such as *Lowery* and *Aviles*, the appellants were challenging restitution fines in excess of the statutory minimum. (*Lowery*, at p. 1055; *Aviles*, at p. 1061.)

Section 1202.4, subdivisions (c) and (d) permit defendants to raise an ability to pay objection when the court imposes a restitution fine above the statutory minimum of $300. Here, because the trial court imposed the minimum restitution fine of $300, defendant did not have a statutory right to object to it. But he *did* have an opportunity to challenge the $300 sex offender fine imposed pursuant to section 290.3, and that fine was presumably determinative of the additional $1,860 ($930 × 2) in penalty assessments (see fn. 6, *ante*, and statutes cited therein).

Section 290.3, subdivision (a) provides: "Every person who is convicted of any offense specified in subdivision (c) of Section 290 shall, in addition to any imprisonment or fine, or both, imposed for commission of the underlying offense, be punished by a fine of three hundred dollars ($300) upon the first conviction or a fine of five hundred dollars ($500) upon the second and each subsequent conviction, *unless the court determines that the defendant does not have the ability to pay the fine*." (Italics added.) The trial court's

imposition of the $300 fine implies a finding of defendant's ability to pay it.  The implied finding is supported by the record, which indicates defendant had a monthly income of $1,300, owned a vehicle worth approximately $5,000, and had no debts or preexisting financial obligations except monthly car insurance premiums of $125.

In *People v. McMahan* (1992) 3 Cal.App.4th 740 (*McMahan*), the appellant's sentence included a fine imposed under section 290.3.  On appeal, this district considered whether the trial court "had a duty to determine he had the ability to pay the fine before its imposition."  (*McMahan*, at p. 748.)  The opinion holds section 290.3 places "the burden upon the defendant to timely raise the issue."  (*McMahan*, at p. 749.)  The appellant was thus deemed to have forfeited his claim by failing to object and/or present evidence of an inability to pay.  (*Id*. at p. 750.)

Defendant acknowledges the *McMahan* case but argues it was recently questioned in *People v. Acosta* (2018) 28 Cal.App.5th 701.  We are not persuaded.  The *Acosta* appellant conceded the issue of forfeiture but alleged ineffective assistance of counsel based on his trial attorney's failure to object to a section 290.3 fine.  (*Acosta*, at pp. 705–706.)

In *Acosta*, the Sixth Appellate District opined "it is the better practice for the trial court to independently inquire at sentencing about the defendant's ability to pay a sexual offender fine irrespective of whether the defendant—or his attorney—requests that the court do so."  (*People v. Acosta*, *supra*, 28 Cal.App.5th at p. 707.)  However, the next paragraph of the opinion states:  "We emphasize that we do not hold that a trial court is obligated to inquire into a defendant's ability to pay a sex offender fine absent the defendant's request."  (*Ibid*.)

We conclude defendant arguably forfeited all ability to pay arguments, including his *Dueñas* claim, by failing to object to the section 290.3 fine.  (Cf. *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["As a practical matter, if [the appellant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not

complain on similar grounds regarding an additional $1,300 in fees"].)  We thus decline to reach the merits of these claims in this appeal.  On remand, defendant may raise these issues in the first instance in the trial court.

## DISPOSITION

The matter is remanded for the limited purpose of having the trial court identify the statutory basis for all imposed penalty assessments and conduct further proceedings consistent with this opinion.  In all other respects, the judgment is affirmed.  The trial court shall then prepare an amended abstract of judgment, which includes the correct spelling of defendant's name (see fn. 1), and send a copy to the Department of Corrections and Rehabilitation.

PEÑA, J.

WE CONCUR:


HILL, P.J.


POOCHIGIAN, J.